RENDERED: AUGUST 24, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000725-MR

LARRY LAMONT WHITE · APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.     HONORABLE JAMES M. SHAKE, JUDGE
NO. 07-CR-004230

COMMONWEALTH OF KENTUCKY · APPELLEE

**OPINION OF THE COURT BY JUSTICE CUNNINGHAM**

**AFFIRMING**

Larry Lamont White, appeals from a judgment of the Jefferson Circuit Court sentencing him to death for the rape and murder of Pamela Armstrong.

Armstrong was murdered on June 4, 1983. Her body was discovered that same day in a public alley, with her pants and underwear pulled down around her legs and shirt pulled up to her bra line. She suffered from two gunshot wounds. One wound was observed on the left side of the back of her head, while the other wound was in virtually the same spot on the right side. The medical examiner was unable to determine which shot was fired first, but did opine that neither shot alone would have caused immediate death.

Although Appellant was originally a suspect, Armstrong's murder remained unsolved for more than twenty years. Yet, in 2004, the Louisville

Metro Police Department ("LMPD") Cold Case Unit reopened Armstrong's case. Through the use of DNA profiling, Detectives sought to eliminate suspects. LMPD officers were able to obtain Appellant's DNA from a cigar he discarded during a traffic stop. Appellant's DNA profile matched the DNA profile found in Armstrong's panties.

On December 27, 2007, a Jefferson County Grand Jury returned an indictment charging Appellant with rape in the first degree and murder. During the trial, DNA evidence and evidence of Appellant's other murder convictions were introduced to the jury. On July 28, 2014, Appellant was found guilty of both charges. Appellant refused to participate during the sentencing stage of his trial. The jury ultimately found the existence of aggravating circumstances and recommended a sentence of death for Armstrong's murder plus twenty years for her rape. The trial court sentenced Appellant in conformity with the jury's recommendation. Appellant now appeals his conviction and sentence as a matter of right pursuant to § 110(2)(b) of the Kentucky Constitution and Kentucky Revised Statute ("KRS") 532.075.

On appeal, Appellant has raised thirty-three claims of error. In reviewing these claims, the Court is statutorily required to "consider the punishment as well as any errors enumerated by way of appeal." KRS 532.075(2). Moreover, since we are dealing with the imposition of death, this appeal is "subject to [a] more expansive and searching review than ordinary criminal cases." *St. Clair v. Commonwealth,* 455 S.W.3d 869, 880 (Ky. 2015) (citing *Meece v. Commonwealth,* 348 S.W.3d 627, 645 (Ky. 2011)). For the sake of brevity, we

2

will approach all claims as properly preserved unless otherwise specified herein. To the extent claims were not preserved for our examination, we will utilize the following standard of review:

> [W]e begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, *e.g.*, whether the failure might have been a legitimate trial tactic; [but] (2) if there is no [such] reasonable explanation, [we then address] whether the unpreserved error was prejudicial, *i.e.*, whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Sanders v. Commonwealth,* 801 S.W.2d 665, 668 (Ky. 1990).

### KRE 404(b) Evidence

Appellant's first and most compelling argument is that the trial court committed reversible error when it allowed the Commonwealth to admit other bad acts evidence of the Appellant as addressed by Kentucky Rules of Evidence ("KRE") 404(b). Prior to trial, the Commonwealth filed notice that it intended to introduce evidence of Appellant's two 1987 murder convictions. These convictions revealed that Appellant pled guilty to murdering Deborah Miles and Yolanda Sweeney.[1] The Commonwealth suggested that the Miles and Sweeney murders were similar enough to Armstrong's murder to demonstrate that Appellant was her killer.

---

[1] On March 12, 1985, Appellant was sentenced to death for the murders of Miles and Sweeney. The Court overturned his convictions and death sentences in *White v. Commonwealth,* 725 S.W.2d 597, 598 (Ky. 1987) due to the Commonwealth's use of Appellant's illegally obtained confessions. Upon remand, Appellant pled guilty to the two murders and was sentenced to twenty-eight years' imprisonment.

3

Miles was discovered dead in her bedroom a mere week after Armstrong's murder. She was naked and had been shot in the left, back side of the head. Appellant claimed that he had known Miles for several months and that she sold drugs on his behalf. Appellant also claimed the two had a sexual relationship. Appellant stated that he shot Miles while at her apartment because she failed to repay him for drugs. Appellant claimed that he did not sexually assault her before or after her murder.

In regards to Sweeney, she was found dead behind a backyard shed approximately four weeks after Armstrong's murder. Sweeney suffered from a fatal gunshot wound to the left side of the back of her head. Her pants were missing and her panties were pulled down around her legs. Appellant stated that he met Sweeney shortly before her death at a nightclub. She agreed to engage in sexual activity with him for $25.00. Appellant claims the two walked to a secluded outside area at which point Appellant provided Sweeney with the money. Appellant admitted to shooting Sweeney after she tried to run away with his money before conducting the agreed upon sexual acts.

The Commonwealth argued that the facts of these two convictions were similar enough to prove Appellant's identity as Armstrong's murderer. Extensive pleadings were filed from both parties and the trial court conducted several hearings on the matter. Ultimately, the trial court was persuaded by the Commonwealth's arguments and allowed the two prior convictions to be introduced to the jury for the purpose of establishing Appellant's identity through his modus operandi.

4

Before evaluating the trial court's admission of Appellant's two murder convictions, we note that reversal is not required unless the trial court abused its discretion. *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky. 2007). Thusly, reversal is unwarranted absent a finding that the trial court's decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

KRE 404(b) prohibits the introduction of "[e]vidence of other crimes, wrongs, or acts" used "to prove the character of a person in order to show action in conformity therewith." This evidentiary rule seeks to prevent the admission of evidence of a defendant's previous bad actions which "show a propensity or predisposition to again commit the same or a similar act." *Southworth v. Commonwealth,* 435 S.W.3d 32, 48 (Ky. 2014). However, such evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). While "modus operandi" is not specifically mentioned within the list of exceptions, this Court has long held that evidence of prior bad acts which are extraordinarily similar to the crimes charged may be admitted to demonstrate a modus operandi for the purposes of proving, *inter alia*, identity. *Billings v. Commonwealth,* 843 S.W.2d 890, 893 (Ky. 1992).

In order for the modus operandi exception to render prior bad acts admissible, "the facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were

5

accompanied by the same *mens rea." English,* 993 S.W.2d at 945. Therefore, we must compare the facts of Appellant's prior murders to the murder of Armstrong, keeping in mind that "clever attorneys on each side can invariably muster long lists of facts and inferences supporting both similarities and differences between the prior bad acts and the present allegations." *Commonwealth v. Buford,* 197 S.W.3d 66, 71 (Ky. 2006).

Whether Appellant's prior murder convictions qualify for the modus operandi exception presents a challenging task for the Court, requiring "a searching analysis of the similarities and dissimilarities." *Clark,* 223 S.W.3d at 97. Our review is even more difficult considering that our jurisprudence on this issue has evolved mostly through the lens of sexual abuse cases. These cases hold that a specific act of sexual deviance may be unique enough to demonstrate that the assailant's crimes are "signature" in nature. *See, e.g., Dickerson v. Commonwealth,* 174 S.W.3d 451, 469 (Ky. 2005); *English,* 993 S.W.2d 941 (all victims were relatives of wife and molestation occurred in the same fashion); *see also Anastasi v. Commonwealth,* 754 S.W.2d 860 (Ky. 1988) (tickling and wrestling with young boys while dressed in only underwear).

Outside the realm of sexual abuse, we have but few cases. In *Bowling v. Commonwealth,* 942 S.W.2d 293, 301 (Ky. 1997), a capital murder case, this Court allowed testimony from the survivor of a previously attempted robbery, wherein Bowling was identified as the assailant. The witness claimed that Bowling came into his service station, attempted to rob the store, and shot at him countless times. *Id.* at 301. The Court upheld the admission of that

6

testimony because there was sufficient similarity between the crimes to demonstrate that Bowling's pattern of conduct was to rob gas stations attended by one worker in the early morning hours. *Id.*

In *St. Clair*, 455 S.W.3d 869, also a death penalty case, this Court upheld the testimony of St. Clair's accomplice, during which he testified about the duo's prior kidnapping and robbery. *Id.* at 886. The accomplice testified that Appellant held the prior victim at gun point, handcuffed him, and stole his late model pick-up truck, taking the victim along for the ride. *Id.* These facts were similar to the crimes to which St. Clair was charged. The Court held that the facts were sufficient to pass muster under the modus operandi exception since in both kidnappings he used the same gun and pair of handcuffs in order to steal a similar type of truck. *Id.* at 887.

What we garner from our case law is that a perpetrator's modus operandi can be established by any number of similarities between the previous criminal acts and the crimes charged, e.g., the type of victims, proximity of the time and location of the crimes, the weapon or ammunition used, the method employed to effectuate the crime, etc. However, we must analyze similarities with caution, as the likeness of the crimes may merely constitute a common characteristic or element of the offense. The Court made this clarification in *Clark v. Commonwealth*, wherein we underscored that "the fundamental principle that conduct that serves to satisfy the statutory elements of an offense will not suffice to meet the modus operandi exception." 223 S.W.3d at 98. For that reason, "it is not the commonality of the crimes but the

commonality of the facts constituting the crimes that demonstrates a modus operandi." *Dickerson,* 174 S.W.3d at 469.

With these cases in mind, we begin with the factual commonalities of the Miles and Sweeney murders with that of Armstrong's. The most noticeable similarity is that all three victims were African-American women in their early twenties, ranging from twenty-one years to twenty-three years old. Another substantial likeness concerns the date and location of all three murders. Appellant murdered Sweeney and Miles within approximately four weeks of murdering Armstrong. The Sweeney and Miles murders also occurred within blocks from Appellant's residence and the location of where Armstrong's body was found. We also place considerable weight on the resemblances between the victims' manners of death. For example, the mode of execution which Miles and Sweeney both suffered was similar to Armstrong's fatal wounds. Specifically, all three victims were shot in the head in the area behind the left ear. Also, and of high importance, the bullets used to kill all three victims were .38 caliber bullets. Moreover, all three victims were each discovered in various stages of undress, which *suggested* they were victims of a sexual assault. The three victims' vaginal areas were likewise all exposed upon the discovery of their bodies.

Turning to the factual differences of the crimes, Miles was killed inside her apartment, while Armstrong and Sweeney were killed outside. In addition, Appellant maintained different levels of association with the three victims. Appellant claims to have known Miles for a few months prior to her death,

8

while both Sweeney and Armstrong appear to have been new acquaintances. The crimes also occurred at different times of the day. Armstrong was murdered in mid to late morning, while Miles and Sweeney were killed at night. Another difference is that the gun that killed Armstrong was not used to kill Miles or Sweeney, even though it was the same caliber weapon. Moreover, unlike the other two victims, Armstrong was shot twice, as the first shot did not cause immediate death. Appellant also points out that there was no forensic evidence that Appellant had sexual contact with either Miles or Sweeney, nor was he convicted of sexually assaulting either victim. We should note that Sweeney's body was too badly decomposed for a rape kit to be performed.

Less persuasive differences are also present. Appellant emphasizes that the victims were discovered in different states of undress. Armstrong was fully dressed with her underwear pulled down around her legs, while Sweeney was found without pants, also with her underwear pulled down around her legs. Miles, however, was discovered completely nude. The Court is hesitant to place great weight on the differences in the victims' states of undress because it likely demonstrates convenience or opportuneness rather than a planned action. *See Anastasi*, 754 S.W.2d at 862 (allowing modus operandi evidence of prior acts of sexual abuse where all victims, except one, were clothed only in underwear).

While the above-mentioned differences are inversely proportional to the degree of similarity needed to meet the modus operandi threshold, our

9

jurisprudence does not require that the circumstances be indistinguishable. *See, e.g., Dickerson*, 174 S.W.3d at 469 (*quoting Rearick v. Commonwealth*, 858 S.W.2d 185, 187 (Ky. 1993) ("[I]t is not required that the facts be identical in all respects . . .")). Nonetheless, this Court is faced with an arduous question: at what point do the dissimilarities become sufficient enough to render the crimes unalike?

We find the case of *Newcomb v. Commonwealth*, 410 S.W.3d 63 (Ky. 2013) most instructive. In that case, *Newcomb* raped two women within a ten-day span. *Id.* at 70. Newcomb raped the first woman, a coworker, in her car after she offered to drive him home. *Id.* The second woman was raped in her home after Newcomb unexpectedly stopped by to visit. *Id.* at 71. Newcomb was tried for both crimes together. *Id.* at 72. This Court upheld the joinder of both offenses, stating that evidence of either rape would be admissible in both trials if severed. *Id.* The Court explained that both rapes were similar enough to establish Newcomb's modus operandi. *Id.* at 74. The similarities relied upon included the victims' ages and race, in addition to the temporal proximities of the crimes. *Id.* The nature of force used was also similar in both rapes, as Appellant's attacks began with forcible kissing followed by a statement like, "You know you like me," or, "You know you want me." *Id.* at 75.

Similar to the case before us, there were numerous differences in the two rapes. For example, the locations of the crimes were not consistent. Newcomb raped one victim in a car after asking for a ride home, while he raped the other victim inside her home when visiting. *Id.* at 76. The levels of

10

acquaintanceships were also different. Newcomb knew one victim from work and had previously shared a kiss with her, while he had only minimal interaction with the other victim. *Id.* In addition, and again similar to the case before us, the crimes were not identically followed through. Newcomb held one victim by the hair, but used minimal force with the other victim. *Id.; see also English,* 993 S.W.2d at 942 (English utilized the covering of a blanket to hide the commission of sexual acts with some of his victims, but not with others).

It is apparent to this Court that the similarities that satisfied the modus operandi threshold in *Newcomb* are no more significant, nor are the differences any less substantial, than those of the facts presently before us. *Newcomb* illustrates that despite factual differences, the crimes' similarities, even if minimal, may be distinctive enough to evidence the perpetrator's identity. We believe those distinguishing similarities exist in the case before us. Indeed, Appellant engaged in a pattern of attacking African-American women in their early twenties within a close proximity during early June through early July of 1983. The most persuasive facts being that these three women were of the same age, race, and suffered a gunshot wound from a .38 caliber bullet to the mid-back, left side of the head while their vaginas were uncovered from the removal of clothing. In our view, the commonality of the facts between the Miles and Sweeney murders and the Armstrong murder presents a substantial degree of similarity. Therefore, we find that the trial court did not abuse its discretion in finding that the crimes' similarities were sufficient enough to demonstrate Appellant's identity through his modus operandi.

11

Having determined that the Miles and Sweeney murders qualified as modus operandi evidence, we must still ensure that such evidence was more probative than prejudicial. KRE 403; *Lanham v. Commonwealth*, 171 S.W.3d 14, 31 (Ky. 2005). The trial court ruled that although the evidence was "extremely prejudicial," the prejudice was outweighed by its high probative worth. We agree.

In conducting a KRE 403 balancing test with respect to modus operandi evidence, "a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *Newcomb*, 410 S.W.3d at 77 (quoting McCormick on Evidence, Ch. 17 § 190).

Accordingly, we begin our analysis by acknowledging that the strength of the Commonwealth's modus operandi evidence is unquestionably strong. The following observation is of great importance to this Court. Unlike other cases in which we have found the existence of modus operandi, the comparative offenses in the case before us were not merely alleged, rather Appellant pled guilty to murdering both Miles and Sweeney. *See Newcomb*, 410 S.W.3d at 70-72 (Newcomb was indicted for the rapes, but had not yet been convicted); *English*, 993 S.W.2d at 942-43 (other prior acts of sexual abuse were only alleged by the witnesses). In addition, and as we have already discussed, the

similarities of the murders are substantial. The close proximity in time and location between each murder further heightens the evidence's probativeness.

In regards to the need for evidence and the efficacy of alternative proof, we find these considerations also weigh in favor of admission. The Commonwealth's only method of proving Appellant's identity as the perpetrator was through the use of DNA evidence. While the DNA evidence certainly proved that Appellant had ejaculated on Armstrong, he argued that he had consensual sex with her perhaps days before her death. Since Appellant provided the jury with a plausible explanation for the presence of his semen, evidence of his modus operandi was highly probative in proving his identity. *See Bowling*, 942 S.W.2d at 301 (evidence of other crimes passed KRE 403 balancing test wherein the evidence rebutted a claimed defense and identification of the defendant as the assailant was at issue).

In concluding our analysis on this issue, we acknowledge that Appellant undoubtedly suffered prejudice from the introduction of his two prior murder convictions. However, we believe the trial court actively managed the jury's understanding of the evidence so as to prevent them from developing "overmastering hostility." In an effort to dissuade prejudice, the trial court admonished the jury about the proper use of the 404(b) evidence after the parties' opening statements. *See Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003) (juries are presumed to follow admonitions). The trial court explicitly explained to the jury that the evidence was only to be considered as evidence of modus operandi and identity. Furthermore, the trial court

13

instructed the jury that the Commonwealth still had to prove each element of the crimes charged beyond a reasonable doubt and that Appellant's prior murder convictions could not be used to establish action in conformity therewith. The trial court provided the jury with a similar instruction just prior to the guilt-phase deliberations. In light of the trial court's actions, in conjunction with the high probative worth of the evidence, we find that the trial court did not abuse its discretion in allowing evidence of Appellant's prior murder convictions.

## *Jury Instructions*

Appellant's next assignment of error is that the trial court's failure to define the terms "modus operandi" and "identity evidence" violated his due process rights. Appellant concedes that this issue is unpreserved.

Appellant contends that "modus operandi" and "identity evidence" are both terms that a juror is unlikely to understand. Consequently, it cannot be assumed that the jury followed the trial court's admonitions to only consider the prior murder convictions for the purposes of demonstrating Appellant's identity through his modus operandi.

In *Lawson v. Commonwealth*, 218 S.W.2d 41, 42 (Ky. 1949), our predecessor Court stated that trial courts must "instruct on the whole law of the case and to include, when necessary or proper, definitions of technical terms used." In support of his argument, Appellant cites *Wright v. Commonwealth*, 391 S.W.3d 743 (Ky. 2013), wherein this Court found that the trial court's failure to define "unmarried couple" within its instructions

14

constituted error. *Id.* at 748. However, *Wright*, a domestic violence case, is distinguishable from the case before us. In *Wright*, the statutory definition of "unmarried couple" is distinctive from what an average juror would understand as a couple who is unmarried. *See* KRS 403.720 (an "unmarried couple" constitutes two individuals who have a child together and either live together or previously lived together). That is not the case here. We can find no evidence that the two terms go beyond the average juror's understanding. *See Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 87 (Ky. 1991) ("knowingly" and "willfully" are not technical terms requiring instructions). Furthermore, to the extent that these terms needed clarification, we believe they were sufficiently "fleshed out" during closing arguments. *Lumpkins ex rel. Lumpkins v. City of Louisville*, 157 S.W.3d 601, 605 (Ky. 2005) ("The Kentucky practice of 'bare bones' instructions . . . permits the instructions to be 'fleshed out' in closing argument.").

### DNA Suppression

Appellant next urges the Court to find reversible error in the trial court's refusal to suppress his DNA sample, which he claims was improperly obtained during an illegal traffic stop. In February of 2006, LMPD Sergeant Aaron Crowell was tasked with covertly obtaining Appellant's DNA. Accordingly, Sergeant Crowell and Detective Hibbs began surveilling Appellant's residence. While watching Appellant's residence, the two officers observed Appellant enter a vehicle as a passenger. The vehicle subsequently left the residence at an unlawful high rate of speed. The officers then stopped the vehicle due to the

15

speeding violation. During the stop, Sergeant Crowell removed Appellant from the vehicle and performed a pat down to check for weaponry. Appellant placed his lit cigar onto the back of the vehicle. After checking the subjects' driver's licenses and running warrant checks, officers permitted the driver and Appellant to leave. No citation was issued. As the vehicle left the scene, Appellant's cigar fell to the ground and was collected.

Appellant filed a motion to suppress DNA evidence recovered from the cigar based on the illegality of the traffic stop. The trial court denied Appellant's motion following evidentiary hearings.

In reviewing a trial court's denial of a motion to suppress, we ensure that the trial court's factual findings are not clearly erroneous, after which we conduct de novo review of the trial court's applicability of the law to the facts. *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky. 1998) (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)). Appellant does not allege that any factual findings are unsupported. As a result, we turn to the trial court's application of the law to the facts.

The trial court relied entirely on *Lloyd v. Commonwealth*, 324 S.W.3d 384 (Ky. 2010) in ruling that the traffic stop was lawful. We can find no error in the trial court's reasoning. In *Lloyd*, this Court explained that an officer may conduct a traffic stop as long as he or she has probable cause to believe a traffic violation has occurred, regardless of the officer's subjective motivation. *Id.* at 392 (citing *Wilson v. Commonwealth*, 37 S.W.3d 745 (Ky. 2001)). The Commonwealth provided sufficient proof that Sergeant Crowell and Detective

16

Hibbs observed the vehicle speeding. Thusly, it is immaterial that Sergeant Crowell desired to obtain Appellant's DNA since adequate probable cause existed.

On appeal, Appellant takes his argument further and suggests that his removal from the car and subsequent pat down was unlawful. The trial court did not address these arguments. Nevertheless, we can quickly dispose of Appellant's contentions. Pursuant to *Owens v. Commonwealth*, 291 S.W.3d 704 (Ky. 2009) an "officer has the authority to order a passenger to exit a vehicle pending completion of a minor traffic stop." *Id.* at 708 (citing *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997)). Furthermore, Sergeant Crowell was permitted to conduct a pat down of Appellant. As his suppression hearing testimony illustrated, Sergeant Crowell maintained a reasonable and articulable suspicion that Appellant was armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). Specifically, Sergeant Crowell testified that he was not only aware of Appellant's proclivity to carry a weapon, but that he previously arrested Appellant for unlawful possession of a handgun. *See also Adkins v. Commonwealth*, 96 S.W.3d 779, 787 (Ky. 2003) ("When an officer believes that he is confronting a murder suspect, he has presumptive reason to believe that he is dealing with an armed and dangerous person."). We have seen no evidence that Sergeant Crowell's quick pat down of Appellant exceeded the scope of *Terry*, nor has Appellant demonstrated that the traffic stop was prolonged to effectuate the pat down.

***Recusal***

Appellant urges the Court to find error in Judge James Shake's refusal to disqualify himself as the presiding trial judge. Appellant claims that Judge Shake, during his tenure as an Assistant Jefferson County Public Defender, represented him in four felony cases in 1981. Appellant only provides the Court with information concerning one of the four cases, criminal case 81-CR-669. In that case, which proceeded to a jury trial, Appellant was charged with sodomy and rape. The Court's records indicate that Appellant was acquitted on the sodomy charge, but found guilty of the lesser charge of sexual abuse.

On July 18, 2014, five days into the jury trial, Appellant moved Judge Shake to recuse himself based on his past representation of Appellant. Appellant argued that prejudice would result if Judge Shake continued presiding over the trial "due to the uncertainty surrounding his knowledge of the [prior] case and/or relevant information obtained during his previous representation of [Appellant]."

Judge Shake conducted a hearing on the motion shortly thereafter. On July 21, 2014, Judge Shake denied Appellant's motion on the grounds of timeliness. Judge Shake, citing *Alred v. Commonwealth, Judicial Conduct Commission,* 395 S.W.3d 417, 443 (Ky. 2012), stated that it is incumbent upon which the party moving for recusal to do so "immediately after discovering the facts upon the disqualification rests . . . ." Judge Shake made clear that on a number of occasions throughout the proceedings, he had informed the parties

18

of his prior representation of Appellant. Accordingly, Appellant should have filed his recusal motion long before the trial began.

In *Bussell v. Commonwealth*, 882 S.W.2d 111 (Ky. 1994), this Court was faced with similar circumstances as that of the case before us. In *Bussell*, also a death penalty case, the defendant filed a recusal motion based on the trial judge's representation of him on murder charges some seventeen years prior. *Id.* at 112. In affirming the trial court's actions, this Court reiterated that Bussell knew or should have known about the prior representation. *Id.* at 113. Bussell's failure to timely assert the issue waived his claim for recusal. *Id.*

Appellant was made aware of Judge Shake's prior representation prior to trial. While we cannot pinpoint the exact date such information was made known, we do know that Judge Shake had presided over the case for over six years as of the time of trial. During this time, Appellant should have been made aware of the prior representation, either through his own recollection or through Judge Shake's acknowledgments. Consequently, we deem Appellant's claim for recusal waived due to the untimeliness of his motion.

Notwithstanding Appellant's waiver, we must still address whether Judge Shake was mandated by statute to disqualify himself. *See Alred*, 395 S.W.3d at 443 (citing *Johnson v. Commonwealth*, 231 S.W.3d 800, 809 (Ky. App. 2007)). There are three separate statutory grounds for recusal which Appellant advances. KRS 26A.015 requires, in pertinent part, that Judge Shake recuse himself if he has (1) "personal knowledge of disputed evidentiary facts concerning the proceeding"; (2) "served as a lawyer or rendered a legal opinion

19

in the matter in controversy"; or (3) "has knowledge of any other circumstances in which his impartiality might reasonably be questioned."

This Court does not believe any grounds for mandatory recusal existed. In regards to the first basis for disqualification, we disagree with Appellant's argument that his 1981 conviction had some type of evidentiary value to the existence of his modus operandi. Not only was his 1981 conviction not introduced during the guilt phase, but Appellant fails to explain how Judge Shake's purported knowledge of that case renders the murders of Sweeney and Miles more similar to the murder of Armstrong. In regards to the second statutory ground for recusal, we find Appellant's argument unpersuasive. While it is true that Judge Shake previously served as Appellant's attorney, he did so in an unrelated case over thirty-three years prior. That particular conviction plainly does not constitute the same "matter in controversy." *See Bussell,* 882 S.W.2d at 112. Lastly, we find difficulty in reasonably questioning Judge Shake's impartiality. Judge Shake was candid about his recollections and explained that he had no memory of Appellant's cases or having any conversations concerning those cases. We will not assume bias based solely on the fact that Judge Shake represented Appellant more than thirty-three years prior to his trial. *Id.* (holding that judge's prior representation of defendant in a murder case did not render him biased). For these reasons, we find no error in Judge Shake's refusal to disqualify himself from presiding over Appellant's trial.

## Chain of Custody

Appellant also requests that we grant him a new trial on the grounds that the trial court improperly admitted unreliable evidence. The evidence Appellant complains of is Armstrong's rape kit, underwear cuttings, and his cigar and buccal swab. Appellant contends that the Commonwealth failed to provide a sufficient foundation for the aforementioned articles due to numerous breaks in the respective items' chains of custody.

The admission of physical evidence requires "a finding that the matter in question is what its proponent claims." KRE 901(a). Said differently, a proper foundation demonstrates that the proffered evidence is the same evidence initially recovered and has not been materially changed. *See Beason v. Commonwealth*, 548 S.W.2d 835, 837 (Ky. 1977). In regards to fungible evidence, such as DNA, the item's chain of custody provides the necessary foundation for admission. *See Thomas v. Commonwealth*, 153 S.W.3d 772, 779 (Ky. 2004). However, the Court has repeatedly approached admission of such evidence in a liberal fashion, concluding that an unbroken chain of custody is not needed. *E.g., Thomas,* 153 S.W.3d at 781. As such, breaks in the chain of custody go to the weight of the evidence, rather than its admissibility. *McKinney v. Commonwealth*, 60 S.W.3d 499, 511 (Ky. 2001).

In reviewing the trial court's ruling, we look for an abuse of discretion. *Thomas,* 153 S.W.3d at 781 (citing *United States v. Jackson,* 649 F.2d 967, 973 (3d Cir. 1981). Our focus is on whether a foundation was sufficiently laid so that there is a reasonable probability that the proffered evidence was not

21

altered in any material respect. *Id.* In making this determination, we look to "the circumstances surrounding the preservation of the evidence and the likelihood of tampering by intermeddlers." *Thomas,* 153 S.W.3d 782 (citing *Pendland v. Commonwealth,* 463 S.W.2d 130, 133 (1971)).

## Cuttings from Armstrong's Panties

Appellant focuses the majority of his argument on the DNA retrieved from the cuttings of Armstrong's panties. Confusion abounds due to several cuttings being taken at two different times and the Commonwealth's inability to specify which path a particular cutting took. To simplify our analysis, we can place the cuttings into two groups originating from LMPD Detective Charles Griffin's collection of the panties from Armstrong's autopsy on June 4, 1983. Nine days later, he delivered the panties to a Kentucky State Police ("KSP") laboratory analyst Morris Durbin, who took cuttings from the areas testing positive for seminal fluids. This is the first group of cuttings. The cuttings were then stored in a KSP freezer where they remained until July of 2006. At that time, some of the cuttings were sent to a different KSP lab. The laboratory technician personally returned the cuttings to LMPD on April 25, 2007, after which they were stored in the LMPD property room. A sufficient chain of custody is patently clear for this first group of cuttings.

The second group of cuttings occurred in 2004, when LMPD was investigating another suspect in Armstrong's murder. At that time, the remnants of the intact panties were transported to the KSP laboratory. This is where the second group of cuttings occurred. These cuttings were returned to

22

LMPD and stored in the property room that same year. The chain of custody for the second group of cuttings has one missing link. After Durbin made the initial selection of cuttings in 1983, there is no direct testimony demonstrating how the remnants of the intact panties made it back to the LMPD property room before being stored until 2004. Nevertheless, discovery indicates that the KSP lab released the panties to LMPD Officer "J. Trusty" on August 10, 1983, the same day they were returned to the LMPD property room. This minimal gap in the chain of custody for the second group of panty cuttings does not render it unreliable. *See Thomas,* 153 S.W.3d at 782. ("All possibility of tampering does not have to be negated. It is sufficient . . . that the actions taken to preserve the integrity of the evidence are reasonable under the circumstances.").

Since there is only one of two paths the panty cuttings could have taken, and both paths demonstrated intact chains of custody, we believe the Commonwealth provided a sufficient foundation demonstrating the reliability of the DNA evidence. It is inconsequential for the purposes of admission which path a particular cutting took. Regardless of whether a particular sample was part of the 1983 or 2004 cuttings, there is little doubt that the "proffered evidence was the same evidence actually involved in the event in question and that it remain[ed] materially unchanged." *Thomas,* S.W.3d at 779. Thusly, the Commonwealth adequately authenticated the evidence. The fact that the Commonwealth was unable to differentiate whether the cuttings were from the first or second batch of cuttings goes to the weight of the evidence.

23

## Rape Kit

Dr. McCloud collected Armstrong's rape kit, after which it was transferred to Detective Griffin during her autopsy. It is unclear if it was Detective Griffin or another officer who placed the kit in the LMPD property room. Nine days later, Detective Griffin transported the kit to a KSP laboratory. The Commonwealth could not pinpoint who transported the kit back to the LMPD property room where it remained until June of 2004. At that time, the kit was once again transported to the KSP laboratory by an evidence technician where it exchanged hands with several identified analysts and technicians and returned to the LMPD property room. A similar exchange took place in 2007, where the kit was transported to a KSP laboratory by an identified evidence technician and was later returned to the LMPD property room. There was no testimony regarding who handled the kit, if anyone, while at the KSP laboratory.

Although there are several breaks in the rape kit's custodial chain, we do not believe these disruptions render the evidence unreliable. The deficiencies in custody are apparently due to careless record keeping in the form of failure to specify who transported the item, rather than actions that would have altered or possibly contaminated the contents of the rape kit. In *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky. 1998), the Court stated that "it is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that 'the reasonable probability is that the evidence has not been

altered in any material respect.'" (quoting *United States v. Cardenas,* 864 F.2d 1528, 1532 (10th Cir. 1989)). As such, the trial court did not err in admitting the evidence, as there was minimal chance that the contents of the rape kit were altered. Once again, we underscore that breaks in the chain of custody go to the weight of the evidence, rather than its admissibility. *McKinney,* 60 S.W.3d at 511.

Appellant also claims that evidence of the rape kit's chain of custody was insufficient due to Detective Griffin and Dr. McCloud, who were both deceased at the time of trial, being unable to testify. Yet, we find that Medical Examiner Dr. Tracey Corey's and LMPD Detective Joel Maupin's testimonies adequately perfected the missing links in the evidence's chain of custody. Dr. Corey testified that Dr. McCloud collected the rape kit during Armstrong's autopsy. Dr. Corey was not present during the autopsy, but confirmed the collection based on the autopsy report. *See Kirk v. Commonwealth,* 6 S.W.3d 823, 828 (Ky. 1999) (coroner's testimony elicited from the autopsy report authored by deceased pathologist was authenticated and admissible). Likewise, Detective Maupin testified that he witnessed Detective Griffin order the rape kit and take custody of the collected kit during the autopsy. Detective Maupin was also able to identify the rape kit as the one collected by virtue of Detective Griffin's signature and date on the rape kit packaging. Thusly, we find no error.

### Buccal Swab and Cigar

As mentioned, Appellant also submits that the Commonwealth failed to establish the chain of custody for his cigar butt and buccal swab. We will not

plunge into a lengthy discussion concerning the custodial history of these items. Instead, we can surmise that Appellant's most persuasive argument is predicated on unidentified individuals who accepted and released the evidence from the LMPD property room. As our analysis has already stated, minor custodial breaches do not automatically render the evidence unreliable. *See Thomas*, 153 S.W.3d at 781. Despite the negligible gaps in custody, the Commonwealth reasonably demonstrated the identity and the integrity of the buccal swab and cigar. Therefore, the trial court did not abuse its discretion by admitting them into evidence.

**Prosecutorial Misconduct**

Appellant alleges numerous instances of prosecutorial misconduct during both the guilt and penalty phase closing arguments. In considering Appellant's claims of prosecutorial misconduct, we will only reverse if the misconduct is "so serious as to render the entire trial fundamentally unfair." *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (2001). We must emphasize that the trial court was required to give the Commonwealth wide latitude during its closing arguments. *Bowling v. Commonwealth*, 873 S.W.2d 175, 178 (Ky. 1993). In addition, the Commonwealth was entitled to draw reasonable inferences from the evidence and explain why those inferences support a finding of guilt. *Commonwealth v. Mitchell*, 165 S.W.3d 129, 131-32 (Ky. 2005).

26

## Guilt Phase

The first instance of misconduct Appellant complains of occurred when the Commonwealth stated the following during closing arguments: "Let's cut to the chase. You had to hear a day's worth of evidence to know what everybody already knew. It was Larry White's DNA on Ms. Armstrong's vagina, her anus, her panties and the back of her pants." Appellant immediately objected, claiming that the Commonwealth was mischaracterizing the evidence. The trial court overruled Appellant's objection, stating that the jury can reconcile the statements with the evidence presented.

Appellant is correct that his DNA was not specifically found on Armstrong's vagina, anus, or pants. While semen was found in those areas, analysts were unable to obtain a DNA profile. Nevertheless, Appellant's DNA matched the DNA profile found on Armstrong's panties with certainty—one in 160 trillion people. From this evidence, the Commonwealth was entitled to draw reasonable inferences and explain why those inferences support a finding of guilt. *Mitchell*, 165 S.W.3d at 131-32. Since evidence indicated that Appellant had sexual intercourse with Armstrong prior to her death, in addition to his DNA being found in her panties, the Commonwealth was permitted to make the reasonable inference that such DNA was present in the semen found on Armstrong's vagina, anus, and pants. *See Tamme v. Commonwealth*, 973 S.W.2d 13, 39 (Ky. 1998) ("The [prosecutor's] alleged misstatements are more accurately characterized as interpretations of the evidence.").

Appellant's second allegation of prosecutorial misconduct occurred when the Commonwealth commented on Roger Ellington's testimony. Appellant believes the Commonwealth's statements had the effect of offering the prestige of the Commonwealth Attorney's Office to support the witness' credibility. Appellant's brief provides a lengthy quote from the Commonwealth which it argues amounted to improper bolstering. After reviewing the Commonwealth's closing argument, we find no need to provide the quote, as there is no merit in Appellant's contention. The Commonwealth merely summarized Mr. Ellington's testimony in a way that was persuasive to their position. *Compare Armstrong v. Commonwealth*, 517 S.W.2d 233, 236 (Ky. 1974) (improper bolstering occurred when the prosecutor informed the jury that he had known and worked with the witness before and the witness was honest and conscientious).

Appellant's third claim of misconduct also concerns Mr. Ellington's testimony. Mr. Ellington is the father of one of Armstrong's children. The defense advanced a theory that Mr. Ellington was Armstrong's killer. In response, the Commonwealth provided the jury with the following closing argument statements: "[Ellington], being accused, having a Fifth Amendment right to remain silent, [] came and sat right here. [Ellington] chose to testify. He took an oath from the judge and he answered the questions. Are those the actions of a killer?" Appellant argues that this statement amounted to an improper comment on Appellant's failure to testify. We disagree.

In *Ragland v. Commonwealth*, 191 S.W.3d 569, 589 (Ky. 2006), the Court explained that "a defendant's constitutional privilege against compulsory self-incrimination [is violated] only when it was manifestly intended to be, or was of such character that the jury would necessarily take it to be, a comment upon the defendant's failure to testify." When placed in the context of the defense's theories, we believe the Commonwealth was appropriately responding to Appellant's allegation that Ellington was Armstrong's killer. Such a comment does not constitute a comment on Appellant's failure to testify. *See Bowling*, 873 S.W.2d at 178 (finding that prosecutor's closing argument statement that "We can't tell you what it is because only the man who pulled the trigger knows" did not amount to a comment on defendant's refusal to testify). As we have explained, "[n]ot every comment that refers or alludes to a non-testifying defendant is an impermissible comment on his failure to testify . . . ." *Ragland*, 191 S.W.3d at 589 (quoting *Ex parte Loggins*, 771 So.2d 1093, 1101 (Ala. 2000)).

Appellant also alleges that the Commonwealth improperly shifted the burden of proof when it reminded the jury that Appellant failed to provide proof that he and Armstrong had a relationship prior to her murder. This Court has long held that a prosecutor "may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). The complained of statement was clearly made to challenge the defense's theory that Appellant's DNA was present in Armstrong's underwear because the two had consensual sex preceding her death. The

Commonwealth's remarks that there was no evidence that such an encounter took place was well within the bounds of closing arguments. We find no error.

## Sentencing Phase

Appellant urges the Court to find that the Commonwealth committed flagrant prosecutorial misconduct when it stated that Appellant's murders of Armstrong, Miles, and Sweeney amounted to "genocide."

The Commonwealth concedes that the prosecutor's use of the term "genocide" was improper. We agree and condemn the Commonwealth's use of such unnecessary and disparaging comments. However, this Court does not believe the remark was severe enough to render the trial fundamentally unfair. While the Commonwealth's remark was obviously deliberate and undoubtedly produced some prejudice, the remark was isolated, being used only once during the closing argument. *See Mayo v. Commonwealth,* 322 S.W.3d 41, 57 (2010). Moreover, the evidence against Appellant, as discussed *supra,* was relatively strong. When viewed in the context of the entire trial, the Commonwealth's brief and minor remark did not undermine the essential fairness of Appellant's trial. *See Murphy v. Commonwealth,* 509 S.W.3d 34, 53-54 (Ky. 2017) (prosecutor's reference to defendant as a "monster" did not constitute reversible error); *Dean v. Commonwealth,* 844 S.W.2d 417, 421 (Ky. 1992) (Commonwealth calling the defendants "crazed animals" did not require reversal).

Next Appellant argues that the Commonwealth improperly urged the jury to sentence him to death for his prior murders of Miles and Sweeney. We find

30

no need to relay the complained of statements. Instead, we resolve Appellant's contentions by finding that the Commonwealth properly commented on the proof presented to the jury, including the fact that he had murdered two other women. We do not believe the Commonwealth's references to the Miles and Sweeney murders exceeded the bounds of permissible closing statements.

Appellant's final claim of prosecutorial misconduct concerns the Commonwealth's statement to the jury that they "never heard one word or witnessed one action of any remorse from the defendant."

Again, this comment was made during the sentencing stage. This argument, while unacceptable during the guilt stage, is germane to sentencing. The United States Supreme Court weighed in on this issue when reviewing this Court's decision. *White v. Woodall,* 134 S.Ct. 1697, 1704 (2014). The nation's highest court ruled that the trial court was not required to give an instruction of no inference of guilt by the defendant's refusal to testify during the penalty stage. The Supreme Court agreed with the trial court's conclusion that "no case law [] precludes the jury from considering the defendant's lack of expression of remorse . . . in sentencing." *See also Hunt v. Commonwealth,* 304 S.W.3d 15, 37 (Ky. 2009) (prosecutor's statement "[h]as anybody seen any remorse from this defendant during the trial?" did not constitute an impermissible comment on defendant's Fifth Amendment rights). There was no error here.

31

### Victim Impact Evidence

Appellant next contends that he was denied a fair trial due to the elicitation of what he believes was victim impact evidence during the guilt phase of trial. This argument is unpreserved and without merit. During redirect examination of one of Armstrong's children, the Commonwealth inquired into the status of Armstrong's other children. The witness merely said that one of his siblings was killed and the other had committed suicide. The witness did not expound on their deaths, nor did he state that their deaths were attributable to their mother's murder. We find no error.

### Directed Verdict

Appellant argues that the trial court erred in failing to grant him a directed verdict of acquittal on the rape and murder charges. We have sufficiently outlined the sufficiency of the evidence in this opinion already to refute this claim. We will not protract this opinion by unnecessarily repeating it here. When viewing the evidence in its entirety, it was not clearly unreasonable for a jury to find Appellant guilty of the crimes charged.

### Statutory Aggravator.

Appellant next urges the Court to vacate his sentence of death on the grounds that the jury failed to find a statutory aggravator. In order to impose the death sentence upon a defendant, a jury must find, beyond a reasonable doubt, the existence of at least one of the statutory aggravators as listed in KRS 532.025(2)(a). In the case before us, the jury was instructed on the following aggravating circumstance:

32

In fixing a sentence for the defendant, Larry Lamont White, for the offense of the murder of Pamela Armstrong you shall consider the following aggravating circumstance which you may believe from the evidence beyond a reasonable doubt to be true: (1) The defendant committed the offense of murder while the defendant was engaged in the commission of rape in the first degree.

Appellant takes issue with the jury's response to this question. The jury's verdict form read as follows: "We the jury, find beyond a reasonable doubt that the following aggravating circumstances exists in the case as to the murder of Pamela Armstrong." Underneath this aggravator, the jury foreman wrote the word "Rape." Appellant claims that the jury's finding of "rape" does not constitute a finding that the Appellant's murder of Armstrong was committed while he was engaged in the commission of first-degree rape.

Appellant's argument has merit to the extent that the jury's one word answer of "rape" does not specify whether the jury believed Appellant committed first-degree rape during the commission of Armstrong's murder. Yet, we may assume that the jury made the proper finding of the statutory aggravator based on the jury's likely interpretation and understanding of the verdict forms and instructions. *See Wilson v. Commonwealth*, 836 S.W.2d 872, 892 (Ky. 1992), *overruled on other grounds by St Clair*, 10 S.W.3d 482. Indeed, our analysis centers on "what a 'reasonable juror' would understand the charge to mean." *Id.* at 892 (citing *Frances v. Franklin*, 471 U.S. 307 (1985)). Based on the instructions and verdict form, the jury was given the option of finding only one aggravator—murder accompanied by first-degree rape, and was instructed that it could not impose a death sentence unless the aggravating circumstance was found. These instructions are clear. In the Commonwealth,

33

we assume that juries follow instructions. *Johnson v. Commonwealth,* 105 S.W.3d 430, 436 (Ky. 2003). Accordingly, since the jury wrote the word "rape" on the verdict form which found the existence of the aggravator, in conjunction with the jury's subsequent imposition of death, we find no error.

### Invalid Indictment

Appellant contends that his conviction and sentence is void as a matter of law because the trial court lacked jurisdiction. Appellant's claim relies entirely on the fact his indictment was not signed by a circuit court judge or circuit court clerk. RCr 6.06 requires only that indictments be signed by the Grand Jury foreperson and the Commonwealth's attorney. Appellant fails to direct the Court to any statutory or precedential authority indicating that the lack of a circuit court judge or clerk's signatures renders the indictment invalid. *See Smith v. Commonwealth,* 288 S.W. 1059 (Ky. 1926) (holding that an indictment was valid despite the absence of the clerk's signature). Furthermore, RCr 6.06 prohibits any challenge to the indictment on signatory grounds "made after a plea to the merits has been filed or entered." Appellant pled "not guilty" to the crimes charged in January 2008, but did not challenge the indictment until July of 2014. For these reasons, Appellant's argument is not only waived, but lacks merit.

### Jury Inquiry

Appellant maintains that the trial court violated his constitutional rights by failing to conduct an adequate inquiry regarding whether any jurors viewed an inflammatory news article. The article at issue was released at the

34

beginning of the trial and labeled Appellant as a "serial killer" who raped and murdered two other women. Appellant moved for a mistrial, arguing that the jury had likely been exposed to the news article. In response, the trial court informed the jurors that a news article was released concerning the case and then asked the jurors if they had followed his previous admonition "not to read anything or watch anything, [or] research anything." The jurors indicated that they had followed the trial court's admonition. Appellant made no further objections about the matter and did not ask for additional admonitions. We believe this unpreserved alleged error is without merit. *See Tamme*, 973 S.W.2d at 26 ("[h]aving properly admonished the jury not to read any newspaper articles about the trial, the trial judge was not required to inquire of them whether they had violated his admonition.").

## *Voir Dire Limitation*

Appellant submits to the Court that his trial was fundamentally unfair due to the trial court's limitation of juror inquiries during jury selection. More specifically, Appellant sought to question the individual jurors about their capacities to consider Appellant's prior convictions for the limited purpose of identity and modus operandi. The trial court narrowed the potential questioning concerning the KRE 404(b) evidence to the commonly utilized inquiries regarding whether the jurors could follow the law and instructions.

Trial courts are granted broad discretion and wide latitude in their control of the voir dire examination. *Rogers v. Commonwealth*, 315 S.W.3d 303, 306 (Ky. 2010). Our review of the trial court's limitations is whether

35

denial of a particular question implicates fundamental fairness. *Lawson v. Commonwealth,* 53 S.W.3d 534, 540 (Ky. 2001). In *Ward v. Commonwealth,* 695 S.W.2d 404 (Ky. 1985), defense counsel attempted to inquire whether potential jurors, when assessing a witness' credibility, could consider the fact that the witness made a deal with the Commonwealth in exchange for his testimony. *Id.* The Court upheld the trial court's limitations on such inquiries because such questions were "to have jurors indicate in advance or commit themselves to certain ideas and views upon final submission of the case . . . ." *Id.* at 407; *see Woodall v. Commonwealth,* 63 S.W.3d 104 (Ky. 2001) (affirming the trial court's limitation of defense counsel's questions concerning whether the jurors could consider a low I.Q. score as mitigating evidence). In light of *Ward,* we do not believe the trial court exceeded its broad discretion. Appellant's questioning would have likely exposed juror views concerning his past murders and possibly committed the jurors to those assessments. As mentioned, less harmful questioning was utilized and allowed Appellant to ascertain whether the jurors could follow the trial court's instruction to consider the evidence for the correct purposes.

### *Venirepersons Struck For Cause*

Appellant next claims that the trial court abused its discretion in striking Juror 1159266 and Juror 1159422 for cause on the grounds that they could not give due consideration to the potential sentence of death. This Court abides by the principles set forth in *Uttecht v. Brown,* 551 U.S. 1, 9 (2007), which held that "a juror who is substantially impaired in his or her ability to impose the

36

death penalty under the state-law framework can be excused for cause, but if the juror is not substantially impaired, removal for cause is impermissible." In *Brown v. Commonwealth*, 313 S.W. 3d 577, 599 (Ky. 2010), this Court discussed the great difficulty in determining whether a potential juror's reservations about the death penalty would "prevent or substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and [their] oath." (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). For this reason, we grant the trial court's wide-ranging discretion, as "this distinction will often be anything but clear and will hinge to a large extent on the trial court's estimate of the potential juror's demeanor." *Brown*, 313 S.W.3d at 599.

With regards to Juror 1159266, voir dire questioning revealed his opposition to the death penalty. Unfortunately for the trial court, his opposition was anything but consistent. When initially asked if he could consider the death penalty, Juror 1159266 responded in the negative. The potential juror subsequently explained that he did not believe in the death penalty, going so far as to say, "I just don't think that being put to death is the proper punishment ever." When Appellant began asking the potential juror questions, he seemed to let up on his previously stated convictions and expressed that he could consider all available penalties. However, further questioning by the Commonwealth once again uncovered his bias against the death penalty and that it was never the proper punishment.

37

Juror 1159422 also expressed contempt for the death penalty. When asked if she could consider the entire range of penalties, the potential juror stated, "I'd prefer not to. . . [and] I wouldn't want to[,] several of them maybe, but not the death penalty." Juror 1159422 went on to explain that she was capable of considering "anything," but clarified that the death penalty is not something she wanted to entertain. She also explained that she was Catholic and didn't "particularly like the death penalty." Appellant provided the potential juror with similar questioning regarding her ability to consider the death penalty as a possible sentence. She replied as follows: "I wouldn't want to, no. I wouldn't want to, but could I? I guess anybody can do anything."

When faced with conflicting and somewhat unclear answers, such as those provided by Juror 1159266 and Juror 1159422, we must look to the jurors' responses as a whole and ask if a reasonable person would conclude that the juror was substantially impaired in the ability to consider the death penalty. *Brown,* 313 S.W.3d at 601. In light of both jurors' unequivocal objections to the death penalty, in addition to their uncertainty and hesitation in imposing a sentence of death, we cannot conclude that the trial court abused its discretion. *See id.* (upholding trial court's for-cause strike of juror who said "I don't know" virtually every time he was asked if he could impose the death penalty).

### Jury Sequester

Appellant complains that he was denied a fair trial due to the trial court's failure to sequester the jury on the weekend between the guilt and sentencing

38

phases. We find no error. RCr 9.66 states that "[w]hether the jurors in any case shall be sequestered shall be within the discretion of the court." Accordingly, in *St. Clair v. Commonwealth,* 140 S.W.3d 510, 558 (Ky. 2004), this Court made clear that it is not an abuse of discretion to refuse "to sequester a jury between the guilt and sentencing phases of a bifurcated trial . . . ." (citing *Wilson v. Commonwealth,* 836 S.W.2d 872, 888 (Ky. 1992), overturned in part by *St. Clair v. Roark,* 10 S.W.3d 482 (Ky. 1999)).

### Mitigating Evidence

Appellant contends that the trial committed error when it denied him the opportunity to inform the jury that he had previously pled guilty to murdering Sweeney and Miles. However, a careful review of the record fails to demonstrate such a ruling. Moreover, we have been unable to locate Appellant's specific request for relief or request that the trial court make a ruling on the matter. *See, e.g., Brown v. Commonwealth,* 890 S.W.2d 286, 290 (Ky. 1994).

### Missing Evidence Instruction

The next issue for our review concerns the trial court's denial of Appellant's request for a missing evidence instruction. The evidence at issue is a printout of food stamp recipients and a bus schedule. The bus schedule was found under Armstrong's body and collected by law enforcement. At the time of trial, the bus schedule was not introduced into evidence and was never located. In regards to the food stamp printout, Armstrong was stated to have left her apartment to obtain food stamps on the morning of her murder, but the

food stamps were missing on her person when her body was discovered. In an attempt to confirm her whereabouts that morning, LMPD Detective Les Wilson testified that he obtained a printout from the food stamp office showing Armstrong as a recipient. After Detective Wilson's testimony, the parties realized the printout was missing. Both parties stipulated this fact and the trial court advised the jury that the food stamp printout was not within the case file. Appellant requested an instruction on the missing evidence. The trial court denied the request on the grounds that Appellant failed to demonstrate that the evidence was intentionally destroyed by law enforcement.

A missing evidence instruction is required only when a "Due Process violation [is] attributable to the loss or destruction of *exculpatory* evidence . . . ." *Estep v. Commonwealth*, 64 S.W.3d 805, 810 (Ky. 2002). In order for Appellant to be entitled to a missing evidence instruction, he must establish that (1) the failure to preserve the missing evidence was intentional and (2) it was apparent to law enforcement that the evidence was potentially exculpatory in nature. *Id.* Appellant has failed to demonstrate either bad faith on the part of law enforcement or that the missing evidence would have had the potential to exonerate him as the assailant. *See Roark v. Commonwealth*, 90 S.W.3d 24 (Ky. 2002) (missing composite sketch of perpetrator and lineup photographs did not require missing evidence instruction because bad faith was not shown and the evidence was not exculpatory). Thusly, the trial court properly denied Appellant's request for a missing evidence instruction.

### Alternative Perpetrator Evidence

Appellant also complains that the trial court erred in failing to permit the introduction of evidence that Michael Board, the father of one of Armstrong's children, was her actual killer. More specifically, Appellant sought to question a testifying detective regarding a warrant taken out by Board against Armstrong five years prior to her death. After the Commonwealth objected, the trial court prohibited the questioning on the grounds that Board being the alternative perpetrator was unsupported and speculative. Appellant preserved the detective's testimony by avowal.

When evaluating alternative perpetrator evidence, the KRE 403 balancing test is the true threshold for admission, as such evidence is almost always relevant. *Gray v. Commonwealth*, 480 S.W.3d 253, 268 (Ky. 2016) ("The proponent of the theory must establish something more than simple relevance or the threat of confusion or deception can indeed substantially outweigh the evidentiary value of the theory."). Probative worth is diminished if the "proffered evidence [presents] speculative, farfetched theories that may potentially confuse the issues or mislead the jury." *Id.*

The only proffered evidence indicating that Board was the alternative perpetrator was the back and forth warrants between the parties during what was obviously a tumultuous relationship. However, the most recent warrant as of the time of Armstrong's death originated five years prior. Taking into account the five-year time lapse, we do not believe the evidence established that Board had a motive to murder Armstrong. Too much time had simply

41

gone by for the warrant to have any true probative worth. The proffered evidence also failed to demonstrate that Board had the opportunity to commit, or that he was in any way linked to, Armstrong's murder. *See Beaty v. Commonwealth*, 125 S.W.3d 196 (Ky. 2003). Appellant's theory was weak and presented itself as speculative and farfetched. Consequently, we do not believe the trial court's ruling was an abuse of its discretion, nor did it prevent Appellant from presenting a full defense.

### *Penalty Phase Exhibit*

Appellant next requests a new sentencing trial based on an unadmitted exhibit being placed with the jury during deliberations. The Commonwealth utilized an enlarged chart illustrating Appellant's criminal history during the sentencing phase of trial. Appellant did not object to the introduction of his criminal history via the testimony of the Commonwealth's witness, nor the use of the chart. The record reflects that the Commonwealth failed to request for the chart to be admitted into evidence. Yet, the jury was allowed to view the chart during its deliberation in violation of RCr 9.72. Nonetheless, the error was harmless as Appellant's criminal history, specifically the most prejudicial convictions—his previous murder convictions—had already been disclosed to the jury on several occasions.

### *Intellectual Disability*

Appellant urges the Court to reverse his death sentence on the grounds that the trial court refused to hold a hearing to explore the existence of an intellectual disability. Once the jury returned a verdict of guilt, Appellant

42

motioned the trial court to remove the death penalty as a possible sentence based on Appellant's low IQ score and the case *Hall v. Florida*, 134 S.Ct. 1986 (2014). The trial court denied Appellant's motion, and declined his request for a hearing on the matter.

The Eighth and Fourteenth Amendments to the United States Constitution prohibit the execution of persons with intellectual disability. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Commonwealth recognizes this rule of law in KRS 532.140, which forbids the imposition of death upon an "offender with a serious intellectual disability." In order for a defendant to meet Kentucky's statutory definition of "serious intellectual disability," and thus evade the death penalty, he or she must meet the following criteria pursuant to KRS 532.135: (1) the defendant's intellectual functioning must be "significant[ly] subaverage"—defined by statute as having an intelligence quotient of 70 or less; and (2) the defendant must demonstrate substantial deficits in adaptive behavior, which manifested during the developmental period.

Procedurally, trial courts require a showing of an IQ value of 70 or below before conducting a hearing regarding the second criteria of diminished adaptive behavior. Moreover, pursuant to *Hall*, 134 S.Ct. 1986, trial courts must also adjust an individual's score to account for the standard error of measurement. *See also White v. Commonwealth*, 500 S.W.3d 208, 214 (Ky. 2016) (pursuant to *Hall*, trial courts in Kentucky must consider an IQ test's margin of error when considering the necessity of additional evidence of

43

intellectual disability). As stated in *Hall,* the standard error of measurement is plus or minus 5 points. *Id.* at 1999.

Appellant submitted to the trial court his 1971 IQ test score of 76. After applying the standard error of measurement, Appellant's IQ score has a range of 71 to 81. Such a score is above the statutory cutoff of 70, thereby failing to meet the "significant subaverage" requirement. Thusly, further investigation into his adaptive behavior was unnecessary. Nonetheless, Appellant submits that *Hall* forbids states from denying further exploration of intellectual disability simply based on an IQ score above 70. However, this Court can find no such prohibition. The holding of *Hall* renders a strict 70-point cutoff as unconstitutional if the standard error of measurement is not taken into account. *Id.* at 2000. In other words, *Hall* stands for the proposition that prior to the application of the plus or minus 5-point standard error of measurement, "an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Id.* (quoting *Atkins v. Virginia,* 536 U.S. 304, 309, n. 5, (2002)). That is not the case before us, as Appellant's IQ, even after subtracting the 5-point standard error of measurement, is higher than the 70-point minimum threshold.

We also reject Appellant's request that we apply the "Flynn Effect" to his IQ score. The Flynn Effect is a term used to describe the hypothesis that "as time passes and IQ test norms grow older, the mean IQ score tested by the same norm will increase by approximately three points per decade." *Bowling v.*

44

*Commonwealth,* 163 S.W.3d 361, 374 (Ky. 2005) (citing James R. Flynn, *Massive IQ Gains in 14 Nations: What IQ Tests Really Measure,* 101 Psych. Bull. 171–91 (1987 No. 2)). Therefore, as applied, Appellant's 1971 IQ score of 76, would actually be 59 by today's standards—71 minus 12 points for the Flynn Effect and 5 points for the standard error of measurement—well below the 70-point threshold. Appellant, however, fails to cite any precedential or statutory authority indicating that trial courts must take into account the Flynn Effect. Indeed, KRS 532.140 is unambiguous and makes no allowance for the Flynn Effect, nor is such an adjustment mandated by this Court or the U.S. Supreme Court. *See Bowling,* 163 S.W.3d at 375-76. Furthermore, even if the Court was obliged to ignore the confines of KRS 532.135 and place less weight on Appellant's IQ score, there is ample evidence of Appellant's mental acumen. For example, Appellant often advocated for himself through numerous pro se motions. One such motion was written so persuasively that defense counsel specifically asked the trial court to rule on its merits. Consequently, we find no error in the trial court's denial of Appellant's motion for an evidentiary hearing or exclusion of the death penalty.

### Competency Hearing

Appellant also requests that the Court find reversible error in the trial court's failure to conduct a competency hearing. Pursuant to defense counsel's motion, the trial court ordered Appellant to undergo a competency evaluation. However, at the scheduled May 10, 2010 competency hearing, the trial court discovered that the Kentucky Correctional Psychiatric Center ("KCPC") was

45

unable to perform an evaluation of Appellant due to his refusal to cooperate. At the scheduled hearing, Appellant informed the trial court that he had several complaints regarding his counsel. As it relates to the issue before us, Appellant explained to the trial court that he was competent and did not want to go to KCPC for an evaluation. Appellant further urged the Court to consider his 1984 evaluation which declared him competent. Several days later, the trial court ordered Appellant's counsel be removed due to irreconcilable differences. The issue of competency was not brought up again until Appellant's motion for a new trial in September of 2014, which was subsequently denied.

Competency hearings are implicated on statutory and constitutional grounds, both having separate standards governing those rights. Per KRS 504.100(1) a trial court must order a competency examination upon "reasonable grounds to believe the defendant is incompetent to stand trial." Subsection (3) of the statute then states that "[a]fter the filing of a report (or reports), the court shall hold a hearing to determine whether or not the defendant is competent to stand trial." Thusly, the state statutory right to a competency hearing only arises after report of a competency examination is filed.

The due process constitutional right to a competency evaluation attaches when there is *substantial evidence* that a defendant is incompetent. *Id.* When reviewing a trial court's failure to conduct a competency hearing we ask "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have

46

experienced doubt with respect to competency to stand trial." *Padgett v. Commonwealth,* 312 S.W.3d 336, 345–46 (Ky. 2010) (quoting *Thompson v. Commonwealth,* 56 S.W.3d 406, 408 (Ky. 2001)). It is within the trial court's sound discretion to determine whether "reasonable grounds" exist to question competency. *Woolfolk v. Commonwealth,* 339 S.W.3d 411, 423 (Ky. 2011).

With respect to Appellant's statutory right to a competency hearing, we believe that issue has been waived. *See Padgett,* 312 S.W.3d at 344 (defendant waived hearing after stating that competency was not an issue). Appellant pleaded with the trial court not to question his competency and his new counsel failed to pursue the matter further.

Upon review of Appellant's constitutional right to a competency hearing, we cannot say that there were reasonable grounds to suspect incompetency. As already stated, Appellant assisted in his defense, often advocating on his own behalf through numerous pro se filings. Appellant was steadfast in the defense he wished to present, even notifying the court of his dissatisfaction with his defense team. Moreover, Appellant was able to comport himself well in the courtroom, conveyed his thoughts without difficulty, and demonstrated a thorough understanding of the charges he faced. In fact, the only indication that Appellant was not competent to stand trial was defense counsel's movement for a competency evaluation. As this Court has previously stated, "defense counsel's statements alone could not have been *substantial* evidence." *Padgett,* 312 S.W.3d at 349. For these reasons, we do not believe a reasonable judge would have expressed doubt about Appellant's competency to stand trial.

47

### Death Penalty

For his final claims of error, Appellant asserts numerous arguments concerning the constitutionality of Kentucky's death penalty statutory scheme and the trial court's imposition of death. Appellant's arguments have already been settled by this Court. *See Meece*, 348 S.W.3d 627 (Kentucky's death penalty is constitutional); *St Clair*, 451 S.W.3d at 655 (proportionality review was sufficient, failure to define reasonable doubt does not violate due process rights, jury does not need to be instructed that it may choose a non-death sentence even upon a finding of aggravating circumstance, and no error in trial judge's report erroneously stating that a "passion and prejudice" instruction was provided to the jury); *Dunlap v. Commonwealth*, 435 S.W.3d 537 (Ky. 2013) (Kentucky's death penalty scheme is not discriminatory, prosecutorial discretion does not render death penalty inherently arbitrary, and jury was not required to be informed of means of execution or parole eligibility); *Mills v. Commonwealth*, 996 S.W.2d 473, 492 (Ky. 1999), *overruled on other grounds by Padgett*, 312 S.W.3d 336 (holding that there "is no requirement that a jury be instructed that their findings on mitigation need not be unanimous").

Moreover, Appellant's contention that our death penalty statute violates the Sixth Amendment pursuant to *Hurst v. Florida*, 136 S.Ct. 616 (2016) is unpersuasive. In *Hurst*, the U.S. Supreme Court found Florida's capital sentencing scheme unconstitutional because the jury only issued a sentencing recommendation, after which the judge made the ultimate factual findings

48

needed for the imposition of death. *Id.* at 622-24. However, under the Commonwealth's statutory scheme, the trial court does not usurp the jury's role in finding the existence of statutory aggravators needed for the imposition of the death penalty.

## Conclusion

For the aforementioned reasons, we affirm the Jefferson Circuit Court's judgment and sentence of death.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate

Erin Hoffman Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Attorney General

Emily Lucas
Assistant Attorney General