RENDERED: NOVEMBER 8, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0719-MR

CLINTON HULSEY                                          APPELLANT

v.                 APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 22-CR-01235

COMMONWEALTH OF KENTUCKY                            APPELLEE

OPINION
AFFIRMING IN PART,
REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE: CETRULO, ECKERLE, AND GOODWINE, JUDGES.

CETRULO, JUDGE: Appellant Clinton Hulsey ("Hulsey") was convicted of first-degree robbery and sentenced to 10 years of imprisonment following a jury trial in the Kenton Circuit Court. He appeals his conviction and sentence because, he argues, (A) the court improperly admitted evidence of other bad acts, and (B) the court erred by not giving the jury his requested lesser included offense instruction.

After review, we find error with regard to the evidentiary ruling, and affirm in part, reverse in part, and remand for a new trial.

## BACKGROUND

On August 4, 2021, Caroline Harris ("Ms. Harris") was working at her shop, Kratom Direct, in Elsmere, Kentucky. Around 2:00 p.m. that day, a man entered Kratom Direct wearing a white N-95 mask, dark colored t-shirt, and tennis shoes with a white stripe around the bottom. Ms. Harris testified that the man briefly spoke to her, walked toward the rear of the store, walked back to the entrance, peered out the front windows, approached Ms. Harris, and moved uncomfortably close to her. The man then punched Ms. Harris, took her cellphone and $250 from the cash register, ordered Ms. Harris to stay on the ground, and left Kratom Direct.

Ms. Harris testified that she had seen a blue car outside the store around the time of the robbery. Detective Eric Higgins of the Elsmere Police Department ("Detective Higgins") investigated the robbery and found Ms. Harris's cellphone one street away from Kratom Direct. Detective Higgins also stopped a blue car near the store, but testified that he determined that the driver did not meet Ms. Harris's description of the robbery suspect.

Another robbery occurred at a gas station in Lawrenceburg, Indiana on August 11, 2021. Footage gathered during the Lawrenceburg robbery

investigation depicted the robber and his getaway vehicle, a black Jeep with a star on the hood. The police investigating the Lawrenceburg robbery posted this footage online and were subsequently contacted by Hulsey's ex-wife and a co-worker of his, who identified Hulsey as the Indiana robber. Hulsey was apprehended in Boone County, Kentucky for the Indiana robbery, and he was briefly detained there before being moved to an Indiana jail. When confronted with the evidence, Hulsey admitted that he was the individual depicted in the Indiana gas station robbery, but stated that he did not remember the robbery.

Hulsey's ex-wife also saw photos of the Kratom Direct robbery and contacted Detective Higgins to inform him that she believed Hulsey was the culprit in the Kratom Direct robbery. She also spoke with Hulsey on the phone, while he was in jail, and informed him that the police had photos of someone that looked like him committing these robberies. Hulsey told his ex-wife that he had no recollection of committing either robbery.

In August 2021, Hulsey lived out of his black Jeep that had the imprint of a star in the hood. Around that time, Hulsey worked as a night shift electrician at an Amazon facility, and, by his own admission, he regularly used methamphetamine and kratom.[1]

---

[1] "'Kratom' refers to both Mitragyna speciosa, a tree native to Southeast Asia, and to products derived from its leaves that are marketed as herbal supplements." NAT'L INST. ON DRUG ABUSE,

Hulsey testified that on August 4, 2021, he got off work at approximately 3:00 a.m., whereafter he unsuccessfully sought to procure drugs. Subsequently, he parked at a gravel parking lot near Target off of Turfway Road in Florence, Kentucky. According to Hulsey, he awoke shortly before noon and, after acquiring some food, went to a Methodist church near his place of employment, where he stayed until approximately 4:00 p.m.

After becoming aware of Hulsey as a suspect, Detective Higgins contacted the Indiana investigators and visited the Indiana jail on August 17, 2021 to interview Hulsey. Detective Higgins showed Hulsey the still photos captured by Kratom Direct's security system, but, while Hulsey admitted that the person in the photos looked similar to him, he stated that he had no recollection of robbing the Kratom Direct store and could not remember exactly what he did on August 4, 2021.[2] Indiana police showed Detective Higgins photos taken from inside Hulsey's black Jeep after he was arrested, and those photos showed a plain black shirt, white cloth mask, and black shoes with white soles in the back seat of the Jeep. Detective Higgins never directly linked Hulsey's black Jeep to the Kratom Direct robbery.

---

https://nida.nih.gov/research-topics/kratom#kratom (last visited Sep. 24, 2020). Kratom products produce an opioid-like effect and are legal in the U.S. *Id*.

[2] At trial, Hulsey testified that he eventually recalled his day on August 4, 2021, due to remembering that he asked his ex-wife for gas money on that day, and he claimed that he did not rob Kratom Direct.

A Kenton County Grand Jury indicted Hulsey for the Kratom Direct robbery. Six days before the trial, the Commonwealth moved to introduce evidence of the Indiana robbery at trial. Typically, Kentucky Rule of Evidence ("KRE") 404 excludes the introduction of other bad acts evidence for charges that the defendant is not facing in the trial. However, the Commonwealth reasoned that the Indiana robbery evidence fell into a KRE 404 exception as it was inextricably intertwined with the Commonwealth's own investigation and proved Hulsey's identity as the Elsmere robber because taken together the two robberies established Hulsey's modus operandi.

Four days after the Commonwealth moved to introduce the Indiana robbery evidence, Hulsey filed a motion in limine to exclude all evidence of the Indiana robbery due to it being inadmissible character evidence and unduly prejudicial to Hulsey. One day before trial, the trial court held a hearing on the admissibility of the KRE 404 evidence. Ultimately, the trial court expressed some concern about admitting all of the Indiana evidence without limitation. The court ruled that portions of Detective Higgins's Indiana video jailhouse interview with Hulsey would be redacted, and the Indiana robbery video would be played on mute from the time Hulsey entered the gas station until the time he left.

At trial, before the Commonwealth's opening statement, the trial court gave the jury an admonition regarding the Indiana robbery evidence and stated

"you may only use any evidence of testimony of bad acts occurring in . . . Indiana as proof of the identity of the defendant, plan, or absence of mistake or accident. You can't use it as proof of guilt." Later in the trial, Hulsey objected again to the introduction of the Indiana robbery video and argued that it was overly prejudicial. At a bench conference, the trial court reaffirmed its ruling that the Indiana robbery video was inextricably intertwined with the Kenton County investigation and that the jury could use evidence of that robbery as proof of Hulsey's identity, plan, or absence of mistake. The video was muted, and the jury viewed the Indiana robbery from the time that Hulsey entered the gas station until the time he left. Throughout the trial, still photos taken from that Indiana security video footage were frequently juxtaposed with the still photos captured by Kratom Direct's security system and presented to the jury and witnesses for comparison. The jury found Hulsey guilty of first-degree robbery, and this appeal followed. Additional facts are added as necessary.

## STANDARD OF REVIEW

We review whether a trial court erred in its evidentiary ruling for an abuse of discretion. *Leach v. Commonwealth*, 571 S.W.3d 550, 553 (Ky. 2019) (citation omitted). Likewise, "[w]e review a trial court's ruling regarding jury instructions for abuse of discretion." *Exantus v. Commonwealth*, 612 S.W.3d 871, 888 (Ky. 2020) (citing *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky.

-6-

2006)).  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Leach*, 571 S.W.3d at 553 (citation omitted).

## ANALYSIS

On appeal, Hulsey asserts that the trial court erred by (A) improperly admitting evidence of "other bad acts," *i.e.*, evidence of the Indiana robbery, and (B) failing to instruct the jury on the lesser included offense of second-degree robbery.[3]  Conversely, the Commonwealth argues the Indiana evidence was properly admitted because it established Hulsey's modus operandi and is inextricably intertwined with the Kratom Direct robbery.  Alternatively, the Commonwealth asserts that if there was any evidentiary admission error, it was harmless.  Also, the Commonwealth asserts that the trial court properly excluded the second-degree robbery jury instruction.

### A. Other Bad Acts Evidence

Generally, KRE 404(b) renders "[e]vidence of other crimes, wrongs or acts" inadmissible to prove propensity to commit an act, but a trial court may admit the evidence:

---

[3] Pursuant to KRE 103(d), Hulsey preserved his first assignment of error when he filed his motion *in limine* to exclude the evidence of the Indiana robbery and when he objected to the introduction of the Indiana robbery video at trial.  Hulsey's second assignment of error is preserved by his request for second-degree robbery instructions at trial, which the trial court declined to give to the jury.  *See Exantus*, 612 S.W.3d at 888.

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 404(b). "[T]he list of exceptions in KRE 404(b)(1) is not exhaustive but illustrative. Prior bad acts may be admitted to show un-enumerated exceptions such as common scheme or plan or *modus operandi*." *Leach*, 571 S.W.3d at 555 (citation omitted) (emphasis added).

The Kentucky Supreme Court "has previously stressed, KRE 404(b) is 'exclusionary in nature'; and, as such, 'any exceptions to the general rule that evidence of prior bad acts is inadmissible should be 'closely watched and strictly enforced because of [its] dangerous quality and prejudicial consequences.'" *Woodlee v. Commonwealth*, 306 S.W.3d 461, 466 (Ky. 2010) (citing *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007)). "In order to determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?" *Leach*, 571 S.W.3d at 554 (citing *Purcell v. Commonwealth*, 149 S.W.3d 382, 399-400 (Ky. 2004)). Again, the relevancy prong must be for a purpose other than to prove "criminal disposition." *Id.* We do not find that the Commonwealth satisfied its burden on

-8-

the relevancy prong; thus, our KRE 404(b) analysis does not reach the second and third prongs.

Here, in the pretrial hearing and at trial, the trial court determined that evidence of the Indiana robbery was relevant (i) to prove Hulsey's identity, plan, and absence of mistake or accident through the modus operandi exception; and (ii) because it was inextricably intertwined with the Kratom Direct robbery and investigation. We address both relevancy assertions separately.

### i. Modus Operandi

Hulsey argues that the Indiana robbery and the Kratom Direct robbery were not "so similar to each other" that they established his modus operandi. Conversely, the Commonwealth argues that the actions in both robberies contained "enough similarities" to establish Hulsey's modus operandi, and that the images of the two robberies are "strikingly similar" because each of the robbers has the "same head shape, haircut, facial hair, and nose shape."

To establish modus operandi "the facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea*." *Leach*, 571 S.W.3d at 555 (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). Failure to establish one of the elements means the "prior misconduct proves only a criminal

disposition and is inadmissible." *Id*. (citation omitted). Here, the Commonwealth attempted to establish the first element and to show that Hulsey committed both robberies.

"[T]he proponent of the prior bad act evidence . . . '[bears] a heavy burden' to show the striking similarity of the acts." *Woodlee*, 306 S.W.3d at 464 (quoting *Clark*, 223 S.W.3d at 96). Further, the party seeking to introduce the bad acts evidence must show "that there is a factual commonality between the prior bad act and the charged conduct that is simultaneously similar and so peculiar or distinct that there is a reasonable probability that the two crimes were committed by the same individual." *Leach*, 571 S.W.3d at 555 (quoting *Clark*, 223 S.W.3d at 97). In *White v. Commonwealth*, our Supreme Court stated that, while "a perpetrator's modus operandi can be established by any number of similarities between the previous criminal acts and the crimes charged, . . . 'it is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates a modus operandi.'" 544 S.W.3d 125, 136 (Ky. 2017), *vacated on other grounds by White v. Kentucky*, 139 S. Ct. 532 (2019) (quoting *Dickerson v. Commonwealth*, 174 S.W.3d 451, 469 (Ky. 2005)).

The high Court has consistently found that actions that meet "the statutory elements of an offense will not suffice to meet the modus operandi exception. Instead, the modus operandi exception is met only if the conduct that

-10-

meets the statutory elements evidences such a distinctive pattern as to rise to the level of a signature crime." *Id*. (quoting *Clark*, 223 S.W.3d at 98) (internal quotation marks omitted). Further, the *White* Court stated that the facts that distinguish the uncharged[4] crime from the crime charged "are inversely proportional to the degree of similarity needed to meet the modus operandi threshold, [but] our jurisprudence does not require that the circumstances be indistinguishable." *Id*. at 137 (quoting *Dickerson*, 174 S.W.3d at 469). Because modus operandi analyses must be conducted on a case-by-case basis, before we analyze the facts of this case, we examine cases where our Supreme Court has and has not found that multiple crimes were signature and established the modus operandi of their perpetrator.

In *White*, the trial court sentenced the defendant ("White") to death for rape and murder. *Id*. at 133. At trial, the Commonwealth introduced evidence of two of White's prior murder convictions. *Id*. at 134. On appeal, the Kentucky Supreme Court observed that the victim of the charged crimes and the victims of the two prior murder convictions were all women of the same race and approximate age. *Id*. at 136. Additionally, each of the three murders occurred

---

[4] We note that, in KRE 404 cases, the term "uncharged" does not mean that the defendant/appellant was never charged for the other bad acts; it means that the other bad acts were not the acts for which the defendant/appellant faced charges in the matter at trial and on appeal. *See generally White*, 544 S.W.3d 125.

"within blocks" of White's home. *Id.* Most notably, each murder occurred in a similar manner. The victims were all shot in a specific location, with the same caliber of bullet, and all three "were discovered in various stages of undress . . . [and their] vaginal areas were likewise all exposed." *Id.* Ultimately, the high Court found that these similarities met the Commonwealth's burden to establish the appellant's modus operandi. *Id.* at 138.

Conversely, in *Clark v. Commonwealth*, our Supreme Court did not find enough similarities to establish modus operandi. 223 S.W.3d at 99. In *Clark*, the trial court sentenced the defendant ("Clark") to 10 years in prison on two counts of sexual abuse against two minor children. *Id.* at 92. At trial, the Commonwealth introduced, and the trial court allowed, the testimony of Clark's previous victim. *Id.* at 95. On appeal, the Court did not agree, stating "that the baseline fact that there was sexual contact between [Clark and his victims] is, in and of itself, not a distinct pattern sufficient to satisfy the modus operandi exception." *Id.* at 98. Likewise, because the victim being under 12 years of age was an element of the crimes Clark was charged with, our Supreme Court found that such conduct merely satisfied a statutory element and was not similar enough to establish his modus operandi. *Id.*

Finally, the Commonwealth in *Clark* asserted that he was in a "position of trust relative to each victim[,]" but the Court disagreed because Clark

acted as the previous victim's priest and was merely a family friend to the victims in the charged crime. *Id*. at 99. This fact actually distinguished Clark's prior crime. *See id*. The *Clark* Court contrasted these facts with other differences between the previous crime and the current crimes, and then stated, "it appears that, at most, there were as many differences as similarities between Clark's past and current alleged conduct." *Id*.

Turning back to the facts of this case, the Commonwealth has asserted that there "were enough similarities" between the Indiana robbery and the Kratom Direct robbery to establish Hulsey's modus operandi. The Commonwealth's asserted similarities include: (1) that both robberies occurred within a week of each other; (2) that Hulsey and the Kratom Direct robber entered each store; (3) that Hulsey and the Kratom Direct robber approached each store clerk and went behind the counters, getting uncomfortably close to them; (4) that Hulsey and the Kratom Direct robber each injured the victims; and (5) that both stores sold Kratom.

For the first similarity, we note that "[t]emporal remoteness goes to the weight, not the admissibility, of the prior bad acts evidence." *Id.* at 100 (citation omitted). That is to say, the temporal proximity of two acts should be considered when conducting the probative value versus prejudicial effect balancing

test during the third prong of the KRE 404 analysis, not as a similarity to establish someone's modus operandi during the first prong of the analysis. *See id.*

The fact that Hulsey and the Kratom Direct robber entered each store, approached the clerks, and injured the store clerks, are not distinct acts that show a signature crime. All robberies involving stores would require a robber to enter a store, and a robber would typically need to get close to the store clerk and cash register to complete the objective of robbery. Furthermore, "physical injury to any person who is not a participant in the crime" is an element of Kentucky Revised Statute ("KRS") 515.020, the crime for which Hulsey was charged. Thus, the respective injuries are merely elements of the charged crimes and not evidence that supports a finding of modus operandi. *See White*, 544 S.W.3d at 136 (quoting *Clark*, 223 S.W.3d at 98).

Additionally, the manner in which the two approaches and attacks occurred are not particularly similar. In the Indiana robbery, Hulsey immediately makes his way to the store clerk, demands that the clerk give him money, stabs the clerk with a box cutter, and struggles to open the cash register to the point that he tries to leave with the entire register. At one point, the Indiana store clerk gets up after Hulsey stabs him and walks around. In the Kratom Direct robbery, the robber initially engages in conversation with Ms. Harris, walks throughout the store, walks back to the front of the store, looks out the store front windows, then he

-14-

approaches Ms. Harris, punches her in the face, apparently opens the cash register with ease, and tells Ms. Harris to stay on the ground when she attempts to get up.

Some weight could be given to the fact that Hulsey and the Kratom Direct robber both moved close to the respective clerks and went behind the counter, but those facts alone are certainly not enough to constitute a signature robbery. Overall, the demeanor of the Kratom Direct robber and Hulsey's demeanor in the Indiana robbery are not strikingly similar. Furthermore, the Kratom Direct robber used only his fists to punch Ms. Harris, while Hulsey used a box cutter to stab the clerk in Indiana.

Finally, while the Commonwealth asserts that the robberies are similar because each store sold kratom, the stores are not the same type of establishment, and this fact cuts against the Commonwealth. Kratom Direct is primarily a kratom store. The Indiana store is a gas station that happens to sell kratom. Additionally, while Hulsey admitted to being a kratom user, neither robber took any kratom. To find that the two stores were strikingly similar for the purpose of establishing Hulsey's robbery modus operandi would be akin to finding that a grocery store and a gas station are strikingly similar because they both sell soft drinks, and the suspected robber drank soft drinks, even though neither store had been robbed of any soft drinks.

The robberies also contain many differences not listed above, including: (1) Hulsey wore gloves in the Indiana robbery while the Kratom Direct robber did not wear any gloves; (2) Hulsey wore a neon-colored shirt and pants in the Indiana robbery, but the Kratom Direct robber wore a dark shirt and shorts; (3) the Kratom Direct robber took Ms. Harris's cellphone, but Hulsey did not take or acknowledge the Indiana clerk's cellphone, which the clerk can be seen facetiming on with another individual throughout the robbery; (4) the robberies took place in two different states; (5) Hulsey's vehicle was identified in the Indiana robbery investigation, but Detective Higgins did not connect his vehicle to the Kratom Direct robbery[5]; (6) Hulsey had a mask around his chin during the Indiana robbery, but the Kratom Direct robber wore a mask on his face the entire time; and (7) Ms. Harris and the Indiana clerk do not share the same gender or race. As the *Clark* Court said, "at most, there were as many differences as similarities between [the perpetrator's] past and current alleged conduct. This state of relative equipoise is insufficient to meet the demanding modus operandi exception." *See Clark*, 223 S.W.3d at 99 (citation omitted).

As Hulsey pointed out to the trial court, the record only contains screen shots of the Kratom Direct robbery, but it contains a full video of the

---

[5] Clothing that was in Hulsey's vehicle somewhat resembled some of the clothing worn by the Kratom Direct robber, but the Commonwealth did not link the vehicle itself to the Kratom Direct robbery.

Indiana robbery. If we had a video of both robberies, perhaps a side-by-side comparison would show striking similarities between Hulsey and the Indiana robber's gait or some other similarity. Alas, we are not afforded that luxury and cannot say that the similarities between the two robberies are strikingly similar, nor do they show a signature robbery style. Because the modus operandi exception focuses on the similarity of how a crime was committed and not the similarity of two criminals' physical characteristics in photographic images, and because the facts surrounding how the Indiana and Kratom Direct robberies occurred are not strikingly similar, we agree that the Commonwealth did not meet its heavy burden to establish Hulsey's modus operandi.

### ii. Inextricably Intertwined

Next, the Commonwealth argues that the evidence of the Indiana robbery was inextricably intertwined with the Kratom Direct robbery and properly admitted because it was necessary for a full presentation of the Commonwealth's case-in-chief, and "the robberies are so closely related that they could not be separated without confusing the jury." Conversely, Hulsey argues that "[a]t a minimum there was no need to show the video of the Lawrenceburg robbery as it was not inextricably intertwined" with the Kratom Direct robbery.[6]

---

[6] While the trial court admitted a variety of evidence related to the Indiana robbery, we shall limit our review to the Indiana robbery video that the jury saw during trial. We limit our focus to the *video alone* because (1) the video is the primary argument on appeal; (2) we are not

-17-

KRE 404(b)(2) allows evidence of other bad acts to be admitted if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party."  Under this prong of KRE 404, other bad act evidence is admissible:

> when . . . [it] furnishes part of the context of the crime or is necessary to a full presentation of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its environment that its proof is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae.

*St. Clair v. Commonwealth*, 455 S.W.3d 869, 885 (Ky. 2015) (quoting *Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012)); *see also Metcalf v. Commonwealth*, 158 S.W.3d 740, 743-44 (Ky. 2005) (quoting *Fleming v. Commonwealth*, 144 S.W.2d 220, 221 (Ky. 1940)) ("evidence is inextricably intertwined where 'two or more crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other'").  As with the modus operandi exception, understanding this exception fully requires

---

permitted advisory opinions (*See Nordike v. Nordike*, 231 S.W.3d 733, 739 (Ky. 2007) ("It is a fundamental tenet of Kentucky jurisprudence that courts cannot decide matters that have not yet ripened into concrete disputes.  Courts are not permitted to render advisory opinions.") (citations omitted)); and (3) on remand the trial court has discretion to allow other aspects of the Indiana robbery to be admitted into evidence.  (*See Leach*, 571 S.W.3d at 554 (citing *Clark*, 223 S.W.3d at 96) ("The admissibility of KRE 404(b) evidence is within the discretion of the trial court.")).

first examining when our Supreme Court has found other bad acts evidence is inextricably intertwined with evidence of a charged crime.

In *St. Clair v. Commonwealth*, the defendant ("St. Clair") faced separate charges, in different counties, for the kidnapping and murder of the same person. 455 S.W.3d at 883-86. On appeal, the Kentucky Supreme Court was addressing KRS 509.040, which heightens kidnapping to "a capital offense when the victim does not survive the kidnapping[.]" *Id*. at 883. The trial court allowed St. Clair's accomplice to testify as to the murder. *Id*. at 885. On appeal, the Court said his testimony set "the scene and offer[ed] context for the kidnapping offense." *Id*. Essentially, the kidnapping offense, which contained an element of death, and the murder of the kidnapping victim were part of the same chain of events, and, thus, the testimony that revealed the murder was inextricably intertwined with evidence in the kidnapping trial. *See id*.

Likewise, in *Kerr v. Commonwealth*, our Supreme Court upheld the lower court's ruling "that it would allow testimony that the police had arrest warrants for Kerr – *but not the crimes underlying the warrants* – and would admonish the jury in order to limit prejudice to Kerr."[7] *Kerr v. Commonwealth,*

---

[7] While not referenced in *Kerr*, the trial court's ruling that allowed the jury to know of the existence of the warrants without disclosing their underlying charges functions similarly to KRE 609, which allows impeachment by evidence of conviction of a crime but forbids disclosure of "[t]he identity of the crime upon which conviction was based . . . unless the witness has denied the existence of the conviction."

-19-

400 S.W.3d 250, 255 (Ky. 2013) (emphasis added).  Before arresting Kerr, the police observed his room at a hotel for six hours, but police had two outstanding arrest warrants for Kerr before they began their observation.  *Id*. at 260.

At trial, the court admitted evidence related to the existence of the arrest warrants and Kerr was convicted on drug and persistent felony offender charges.  *Id*. at 253.  On appeal, the Court stated that "[k]nowledge of the arrest warrants was necessary for the jury to understand why the police set up the extensive surveillance and . . . [w]ithout knowing of the arrest warrants, the jury would have been left to wonder about the legitimacy of the officers' actions[.]"  *Id*. at 260.  Thus, because the testimony that revealed the warrants' existence related to the legitimacy of the arrest that resulted in the underlying charges, our Supreme Court held that the warrant evidence was inextricably intertwined with the crimes Kerr faced at trial.  *See id*.

Conversely, in *Metcalf v. Commonwealth*, the Kentucky Supreme Court reversed and remanded "for a new trial because of the improper admission" of other bad acts evidence.  158 S.W.3d at 741.  In *Metcalf*, the "jury convicted [] Metcalf of one count of sodomy in the first degree . . . and one count of sexual abuse in the first degree[,]" for acts he committed against his stepdaughter.  *Id*. at 741-42.  At trial, an employee of the Cabinet for Families and Children and a Kentucky State Police detective testified regarding a "videotaping incident" that

-20-

occurred between Metcalf and a different stepdaughter. *Id.* at 742-44. The trial

court believed that because the state employees' investigation originated from a

complaint about the videotaping incident, evidence regarding the incident was

inextricably intertwined with the charged crimes and admissible at trial. *Id*. at 742.

The trial court reasoned that the videotaping incident "explained why [the state

employees] had gone to [Metcalf's] residence and interviewed" the stepdaughter

that was the victim of the crimes that Metcalf faced charges for at trial. *Id*.

Our Supreme Court disagreed and reiterated that "[t]he key to

understanding this exception is the word 'inextricably.' The exception relates only

to evidence that *must come in* because it 'is so interwoven with evidence of the

crime charged that its *introduction is unavoidable*.'" *Id.* at 743 (quoting *Funk v.

Commonwealth*, 842 S.W.2d 476, 480 (Ky. 1992) (emphasis in original)). The

Court went on to say "[i]t would have been a simple matter for [the state

employees] to truthfully testify that they came to [Metcalf's] residence to

investigate an allegation of child abuse without mentioning the uncharged

videotaping incident." *Id*. at 744.

Here, the Commonwealth argues that the jury would have been

confused if the trial court had limited the evidence regarding the Indiana robbery,

because "[t]he Commonwealth needed to explain the police investigation and how

Hulsey was identified as the suspect." This may have been true for portions of the

-21-

Indiana robbery evidence, but the Indiana robbery security footage itself was not inextricably intertwined with the Kratom Direct robbery. The Indiana robbery footage was not "part of the context of the [Kratom Direct Robbery]." *See St. Clair*, 455 S.W.3d at 885 (quoting *Webb*, 387 S.W.3d at 326). The robberies occurred a week apart, at different locations, and in different states. Seeing the Indiana robbery footage did not provide any additional context for the circumstances surrounding the Kratom Direct robbery. Furthermore, the Indiana robbery footage was not "necessary to a full presentation of the case, [nor was it] so intimately connected with and explanatory of the crime charged against" Hulsey. *See id*.

The Commonwealth argued that footage of Detective Higgins interviewing an incarcerated Hulsey in the Indiana jail would confuse the jury. However, "[i]t would have been a simple matter" for the Commonwealth to present evidence that alluded to Hulsey's incarceration for another crime. *See Metcalf*, 158 S.W.3d at 744. In fact, the jury heard evidence regarding Detective Higgins's communications with the Indiana authorities and their investigation. However, playing footage of the commission of that other crime was unnecessary to achieve the Commonwealth's goal of giving the jury an unfragmented presentation of its case.

Additionally, it would have been just as simple to explain Hulsey's identification through the testimony of his ex-wife, who brought Hulsey to the attention of Detective Higgins.[8]  Accordingly, the "exclusion" of the Indiana robbery footage "would not have required suppression of any facts and circumstances relevant" to Hulsey's charges for the Kratom Direct robbery.  *See id*. at 744-45.  Unlike in *Kerr*, video evidence of the Indiana robbery was not needed to present a complete picture of the circumstances surrounding Hulsey's arrest.

The trial court abused its discretion in admitting the Indiana robbery video because that evidence did not fall under the modus operandi exception, nor was it inextricably intertwined with the Kratom Direct robbery.  *See English*, 993 S.W.2d at 945.

Our analysis of the three prong KRE 404(b) test ends on the test's relevancy prong.[9]  However, it is clear from the record that the trial court grappled

_____

[8] It is unclear from the record whether Detective Higgins first identified Hulsey at the direction of Hulsey's ex-wife or by coming across photos and video of the Indiana robbery on his own.  However, in his testimony, Detective Beetz makes clear that Detective Higgins reached out to him first.  Either way, the Commonwealth's case-in-chief did not depend on playing the Indiana robbery footage to the jury for identification purposes.

[9] Even if we had found that the Indiana robbery video met a 404(b) exception, we would deem it inadmissible under the balancing test prong.  "Under this test, even relevant evidence, such as that satisfying KRE 404(b), 'may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.'"  *St. Clair*, 455 S.W.3d at 889 (quoting KRE 403).  Like our Supreme Court stated in *St. Clair*, we think that "a substantial portion of the Commonwealth's prosecution[,]" *i.e.*, playing the Indiana robbery

-23-

with this evidentiary determination and expressed concerns that the admission of the Indiana robbery evidence could cause undue prejudice, *i.e.*, it could lead the jury to conclude that because Hulsey committed the Indiana robbery, he must have committed the Kratom Direct robbery. We suspect that is what may have transpired. While we "acknowledge[] that determinations regarding the admissibility of other bad acts evidence . . . are extremely difficult, given their fact specific nature." *Leach*, 571 S.W.3d at 557.

We must now determine if the trial court's abuse of discretion resulted in a harmless error.

### iii. Harmless Error

The Commonwealth argues that any error was harmless because "[t]here was ample evidence in the photographs identifying Hulsey as the suspect along with clothing matching the Kratom Direct robbery suspect's being found in his Jeep." Additionally, the Commonwealth argues that "the jury was given an admonition that it could only consider the evidence of the Indiana robbery as proof of Hulsey's identity and plan, or of absence of mistake or accident . . . [a]nd a 'jury is presumed to follow an admonition to disregard evidence and the admonition thus

---

video, "focused on" Hulsey's other bad acts. *See id*. "Moreover, the Commonwealth injected what amounted to a whole other [] offense . . . into this case, risking confusion of the issues in this case and risking misleading the jury into focusing on" the Indiana robbery. *See id*. "The probative value of [the Indiana robbery video] was substantially outweighed by the danger of undue prejudice, confusion of the issues, and misleading the jury." *See id*.

-24-

cures any error.'" *See Carson v. Commonwealth*, 621 S.W.3d 443, 450 (Ky. 2021).

Conversely, Hulsey argues that "[s]uch an error was not harmless[,] . . . [and] this error substantially influenced the result and at least there is 'grave doubt' of the result." *See Hall v. Commonwealth*, 468 S.W.3d 814, 828 (Ky. 2015). We agree with Hulsey.

We will find an error harmless and we will not reverse a trial court's judgment, "if we can say with fair assurance that the judgment was not substantially swayed by the error." *Carson*, 621 S.W.3d at 450 (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010)). "Our inquiry is not simply whether there is enough evidence to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* (citation omitted).

"[U]nder our case law, the 'jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error.'" *Id.* (quoting *Dunlap v. Commonwealth*, 435 S.W.3d 537, 570 (Ky. 2013)). The *Carson* Court went on to say:

> Such presumption can be overcome by a showing either that there is an (1) "overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible

-25-

evidence would be devastating to the defendant," or (2) the question asked lacks any factual basis and was highly inflammatory.

*Id.* (quoting *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003)).

Here, we begin our analysis with whether the trial court's admonition cured the error. Immediately before the Commonwealth's opening statement, the trial court gave the jury an admonition and stated "you may only use any evidence of testimony of bad acts occurring in . . . Indiana as proof of the identity of the defendant, plan, or absence of mistake or accident. You can't use it as proof of guilt."

Essentially, the trial court's admonition instructed the jury to only use the Indiana robbery evidence for the exceptions listed in KRE 404(b). Given that we have already determined that the Indiana robbery video did not fall within those limited exceptions in KRE 404(b), it would not be logical to say that an admonition that instructs the jury to use the video for those purposes cured the error.

Even if the admonition had "attempt[ed] to remedy the introduction of inappropriate testimony," *i.e.*, the Indiana robbery video, we believe that playing the video resulted in an "overwhelming probability that the jury [was] unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence [was] devastating to [Hulsey][.]" *See id.* (quoting *Johnson*, 105 S.W.3d at 441). To be clear, the trial court allowed the jury to view Hulsey

-26-

committing a completely separate robbery and stabbing the store clerk in that robbery. Hulsey admitted to being the robber in that case. Even with a proper admonition, the most steadfast juror would be hard pressed to refrain from using the Indiana robbery video to determine Hulsey's propensity to commit the Kratom Direct robbery.

Likewise, we cannot "say with fair assurance that the judgment was not substantially swayed by the error." *See Carson*, 621 S.W.3d at 450 (quoting *Brown*, 313 S.W.3d at 595). When the jury watched the Indiana robbery video, they saw a man (who Hulsey admitted to being) commit a robbery, the same crime committed in the instant case. Hulsey's physical characteristics in that Indiana video resemble the Kratom Direct robber. It would be easy for jury members to use the Indiana robbery video to mentally fill in the gaps of what happened in the moments not captured by the Kratom Direct security footage screenshots. We cannot say, without grave doubt, that viewing the Indiana robbery video did not substantially influence the jury's decision.

Additionally, we find the Commonwealth's assertion that the error was harmless because of the "ample evidence" identifying Hulsey ill-placed. Our task is not to decide whether there was enough evidence to convict Hulsey, even without the Indiana robbery video. We must determine whether the Indiana video substantially influenced the jury, despite the weight of the other evidence.

In *Hall*, our Supreme Court had to decide whether the trial court committed a harmless error when it allowed the jury to view 28 duplicative gruesome photos of the victims in a murder trial. 468 S.W.3d at 827. The high Court stated, "it is difficult for us to surmise any reason for introducing all 28 photos other than to elicit unduly prejudicial emotional responses from the jurors. . . . [T]his Court simply cannot say with fair assurance that the verdict was not substantially swayed by the erroneous admission[.]" *Id.* at 827-28.

Here, unlike *Hall*, the Indiana video did not depict any of the circumstances or consequences of the crimes committed in Elsmere, Kentucky. *See id.* Therefore, showing the Indiana video of Hulsey robbing and stabbing a gas station clerk came with a high likelihood of substantially swaying the jury's verdict. Thus, we cannot find that the trial court's error was harmless.

Accordingly, we reverse Hulsey's conviction for first-degree robbery and remand for a new trial.

### B. Lesser Included Offense Jury Instruction

Hulsey argues that the trial court erred by not instructing the jury on the lesser included offense of second-degree robbery, KRS 515.030, because the jury could have reasonably doubted whether Ms. Harris suffered a "physical injury" as defined in KRS 500.080(17). The first-degree robbery statute, KRS 515.020, requires one of three aggravating factors to be met before a defendant can

-28-

be convicted. The first aggravating factor, and the one relevant on this appeal, in KRS 515.020(1)(a) requires the defendant to cause "physical injury to any person who is not a participant in the crime[.]"

Conversely, the Commonwealth argues that the evidence did not support an instruction for second-degree robbery, and that the jury could not have reasonably doubted whether Ms. Harris suffered a physical injury. On this point, we agree with the Commonwealth.

In *Exantus*, our Supreme Court said that "[t]rial judges have a statutory duty to instruct the jury on the whole law of the case, *i.e.*, any instruction inferable or supported to any extent by the evidence presented at trial." 612 S.W.3d at 888 (citing *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999)). KRS 505.020(1) states that a defendant "may not . . . be convicted of more than one (1) offense when . . . one offense is included in the other, as defined in subsection (2)[.]" KRS 505.020(2) states:

> A defendant may be convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when:
>
> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]

The first-degree robbery statutory language and second-degree robbery language are nearly identical, except that the second-degree statute omits the aggravating factors listed in the first-degree statute. *See* KRS 515.020; *see also* KRS 515.030.

In deciding whether the trial court erred by not giving the second-degree robbery instruction, we must "consider the evidence in a light most favorable to" Hulsey. *Exantus*, 612 S.W.3d at 888 (citing *Thomas v. Commonwealth*, 170 S.W.3d 343, 347 (Ky. 2005)). But, the trial court need not "instruct on a lesser-included offense simply because [Hulsey] requests it." *See id.* (citing *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky. 2012)). If the jury, "considering the totality of the evidence," could have reasonably doubted that Hulsey committed first-degree robbery, but still could have found that he committed second-degree robbery, then the trial court would have been "required" to give the lesser included offense instruction. *See id.* at 889 (citing *Swan*, 384 S.W.3d at 99).

Thus, the only question presented here is whether the jury could have reasonably doubted that Ms. Harris suffered from a physical injury. KRS 500.080(17) states that "'[p]hysical injury' means substantial physical pain or any impairment of physical condition[.]" In *Meredith v. Commonwealth*, this Court said that "impairment of physical condition simply mean[s] injury." 628 S.W.2d 887, 888 (Ky. App. 1982) (internal quotation marks omitted). This Court

-30-

reaffirmed that standard in *Hubbard v. Commonwealth* when a robbery victim felt "pain in her left hip . . . [but] [x]-rays of her left hip did not reveal any fracture." 932 S.W.2d 381, 383 (Ky. App. 1996). While the victim testified about the degree of her pain, "[n]o expert medical testimony was offered as to the extent of any injury [she] suffered as a result of the robbery." *Id*. Furthermore, our Supreme Court affirmed the *Meredith* standard in *Exantus* when it stated:

> In the intervening thirty-eight years, *Meredith*'s holding has come to be more colloquially stated as physical injury means *any* injury. Things as minor as a small wound not past the epidermis, with no blood loss, pain in the left hip, and a bruised face and a scratch below the eye have all qualified as physical injuries under this definition. Exantus urges this Court to overturn our straightforward interpretation and replace it with a test that would determine whether a victim suffered a physical injury on a case-by-case basis, though he does not discuss how the term any impairment of physical condition could be interpreted differently. Regardless, we decline to overturn *Meredith*, as its holding remains sound.

*Exantus*, 612 S.W.3d at 886 (internal quotation marks and citations omitted.).

The Court went on to say that the "General Assembly . . . said any impairment of physical condition, and it meant any impairment of physical condition, i.e. any injury. [And] [that] conclusion is further bolstered by the fact the General Assembly has not altered its definition of physical injury in the nearly four decades since . . . *Meredith*." *Id*.

Here, the evidence presented at trial revealed that the Kratom Direct robber punched Ms. Harris in the face. She briefly lost consciousness and her sense of hearing. When she regained consciousness, she felt sweat emanating from her whole body. The punch left a red mark on her face, and she vomited shortly thereafter. The Commonwealth evinced these facts through Ms. Harris's testimony, the bodycam footage of an Elsmere police officer, and screenshots obtained from Kratom Direct's security system. Hulsey does not dispute any of these facts but simply contends that, because Ms. Harris got up from the floor "11 seconds" after she was punched and did not receive medical treatment, the jury could reasonably doubt that she suffered physical injury.

The relevant statutes and the standard for physical injury upheld by this Court and our Supreme Court do not support Hulsey's argument. Under the standards established by KRS 500.080(17), *Meredith*, and now over 40 years of Kentucky precedent, the Commonwealth proffered evidence that showed that Ms. Harris "clearly" suffered a physical injury. *See Exantus*, 612 S.W.3d at 886. Furthermore, "no evidentiary basis existed upon which the jury could have had reasonable doubt" as to whether Ms. Harris suffered a physical injury. *See id*. at 889. Thus, we cannot hold that the trial court abused its discretion or acted "in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal

principles" by not instructing the jury on the lesser included offense of second-degree robbery. *Id*. at 888.

## CONCLUSION

Because the Indiana robbery video did not fall under a KRE 404(b) exception, and because the trial court's error, admitting that video into evidence and allowing the jury to view it, was not harmless, we REVERSE Clinton Hulsey's conviction for first-degree robbery and REMAND for a new trial. We AFFIRM the trial court's ruling as to the jury instructions.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Robert C. Yang
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General
Frankfort, Kentucky